William H. McALPINE, John Folino, Joseph Stolaruk, Donald Stewart, Donald Layman, John E. Prior, Stuart W. Adams, Aaron A. Reavis, Evelyn W. Smith and Luther J. Smith, Plaintiffs and Counterclaim-Defendants,

v.

AAMCO AUTOMATIC TRANSMISSIONS, INC., a Foreign Corporation, Defendant, Counterclaim-Plaintiff and Third-Party Defendant,

v.

Aram MAGARIAN, Luther J. Smith, III, J. B. Delco, Inc., SSS Corporation, LJS Corporation, SLJ Corporation, Layman and Stewart, Inc., William H. McAlpine, Inc., Tombly Enterprises, Inc., Interstate Automatic Transmissions Co., Inc., Jay Enterprises, Inc., Donald & Donald, Inc., and Cox & Reavis Transmissions, Inc., Third-Party Defendants.

Civ. A. No. 4–70762.

United States District Court,
E. D. Michigan, S. D.

April 3, 1978.

Richard A. Solomon, Detroit, Mich., for plaintiffs and counterclaim-defendants.

Sheldon S. Toll, Detroit, Mich., R. Michael Kennedy, Jr., Bridgeport, Pa., for defendant, counterclaim-plaintiff and third-party defendant.

## OPINION

GUY, District Judge.

This case was brought by William McAlpine and eleven other individuals (hereinafter referred to as "plaintiffs") against AAMCO Automatic Transmissions, Incorporated, a Pennsylvania Corporation and the largest franchisor of transmission repair shops in the United States (hereinafter referred as to "defendant"). Plaintiffs were all licensed franchisees of AAMCO operating in the greater Detroit area when they broke away from AAMCO in November, 1973, to form Interstate Transmissions, the competing transmission repair business that is the subject of this lawsuit.

When plaintiffs broke away from AAMCO on November 29, 1973, they instituted suit against AAMCO in this court. Their complaint alleged that certain AAMCO marketing and tie-in practices had constituted a breach of contract and violation of antitrust laws, such breach and violation entitling plaintiffs to leave AAMCO and go into business as Interstate Transmissions. AAMCO answered by defending its prac-

tices, then counterclaimed alleging that when plaintiffs broke away from AAMCO they wrongfully terminated Franchise Agreements, violated antitrust laws, infringed on AAMCO's trademark, and misappropriated the AAMCO merchandising system.

The case was tried by this court without a jury for nine days concluding on November 3, 1977. At that time the court found in favor of plaintiffs in part, in favor of defendant in part, and took certain matters under advisement. After careful consideration of the evidence, stipulations and pertinent authorities, the court has now concluded that the contracts at issue were breached by plaintiffs and that damages in the amount of $412,708.49 are owing to defendant.

During the trial it became evident that the major theme of this case would concern the problem of the successful franchisee who becomes dissatisfied in his franchise arrangement and desires to sever relations with the franchisor. This is an emerging and increasing phenomenon in franchisee-franchisor relationships. See *Impact of Franchising on Small Business*, A Report of the Select Committee on Small Business, United States Senate, November 13, 1970. See also, "Problem Areas of Franchising," Federal Trade Commission Study; Appendix IV, reprinted in *Antitrust Laws and Trade Regulation*, Von Kalinowski, Vol. 9, App. III–A–105 (1976).

This phenomenon may involve the franchisee who finds that the profits he anticipated from gross sales are being consumed by an array of payments to the franchisor not revealed to the franchisee prior to operation. Or, the franchisee may find that the profits he expected to make are substantially less than the franchisor's promotional statements led him to believe would be forthcoming. See "Problem Areas of Franchising," Federal Trade Commission Study, *supra.*

Sometimes, however, as in this case, the scenario is different. The franchise arrangement starts as a mutually advanta-

geous business relationship. Both the franchisor and franchisee contribute to this arrangement in order to obtain benefits they could not obtain independently. The franchisor's contribution is a combination of several factors: trademark, recognized product or service, experience, advertising and management support. The franchisee's contribution is capital, day-to-day management of the franchise, and the payment of franchise fees—usually in the form of a set percentage of gross franchise sales once the franchise has become operational. See *Antitrust Laws and Trade Regulation*, Von Kalinowski, § 65.01(2), and Appendix III–A–108, Vol. 9 (1976) for a good discussion of this subject.

The franchisor benefits from the use of franchisee capital, fees, and lower-level management, for it allows the franchise organization to expand more rapidly than would otherwise be possible. Similarly, the benefits to the franchisee are: greater independence than the status of an "employee" would confer, the opportunity to make money, and a reduction—by virtue of a proven trademark and system—in the risk of failure associated with owning and operating a small business.

As the franchise becomes successful, however, the partnership arrangement which seemed reasonable at its inception sometimes appears burdensome to the franchisee. The franchisee whose hard work has enabled him to carve out a niche of profitability comes to regard the payment of franchise fees as restricting that profitability. The franchisee who has learned a system and has reaped its benefits wonders if his new-found knowledge of the trade could enable him to prosper to a greater degree as an independent. Status, success, name, and product all seem brighter to an independent businessman or as franchisee under different terms.

Such a situation became a reality for the plaintiffs in November, 1973, when they broke their Franchise Agreements with AAMCO. After four years of litigation, this court now makes the following dispositions on the issues raised:

## A. PLAINTIFFS' TIE–IN CLAIM:

Plaintiffs contend that AAMCO has violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by imposing a tie-in arrangement in connection with the licenses granting plaintiffs use of AAMCO's trademark. The contention is that AAMCO, by virtue of its dominant economic power over its franchisees, used threats of disenfranchisement to coerce plaintiffs into purchasing AAMCO transmission repair and automotive parts for use in each plaintiff's repair shop. As a result of this alleged coercion and abuse of dominant power by AAMCO, the plaintiffs claim they were forced to purchase transmission repair and automotive parts at prices higher than offered in the open market. Plaintiffs cite several types of acts which could constitute a tie-in violation:

(1) non-negotiable contractual provisions;
(2) threats of termination for not buying AAMCO parts;
(3) publicizing disenfranchisement for not buying AAMCO parts;
(4) allegations of consumer fraud for not buying AAMCO parts;
(5) regular inspections to "police" the alleged tie;
(6) the use of computerized records to "police" the alleged tie.

At the outset, however, plaintiffs' theory that a contractual tie-in arrangement was accomplished via any non-negotiable contract provisions must be rejected. Pursuant to a November 1969 court order AAMCO agreed to modify its Franchise Agreements to allow franchisees to "install parts of equal quality, type, and quantity" to AAMCO parts or assembly sets (Pretrial Order, Exhibit A). Although the modification allowed plaintiffs to purchase parts only from those vendors determined by AAMCO to offer "equal quality" parts, it is well established that the licensor of a registered trademark owes a duty to the public to monitor the quality of parts sold by its licensed dealers. *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43, at 51 (9th Cir. 1971). For a licensor, through relaxation of quality control, to permit inferior products to be

presented to the public under its licensed mark might well constitute a misuse of the mark. 15 U.S.C. §§ 1055, 1127. AAMCO therefore had the right, if not the duty, to establish a minimum "equal quality" standard for the transmission parts used by its franchisees.

■ An illegal tie-in need not be accomplished by a formal contractual provision, however. *Advance Business Systems & Supply Co. v. SCM Corporation,* 415 F.2d 55, 63–64 (4th Cir. 1969). In the absence of a formal provision, the presence of an illegal tying condition may be inferred from an extrinsic course of conduct supplementing any written contract. *Osborn v. Sinclair Refining Co.,* 286 F.2d 832 (4th Cir. 1960). Such conduct might consist of proof of a persistent and deliberate course of coercive dealing through misrepresentations and threats of cancellation, *N. W. Controls, Inc. v. Outboard Marine Corp.,* 333 F.Supp. 493, at 511 (D.C.Del.1971), the crucial factor being that economic power be utilized to coerce the purchase of the tied product. *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

■ The three requisites of a per se illegal non-contractual tying arrangement are thus:

(1) There must be two separate products, one the tying product which cannot be obtained without purchase of the tied product. *Times-Picayune Publishing Co., supra.*

(2) The seller must have sufficient economic power with respect to the tying product to appreciably restrain competition in the market for the tied product. *Northern Pacific Ry. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

(3) The antitrust violation must affect a "not insubstantial" amount of commerce. *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947).

■ The alleged tying product in this case is the AAMCO trademark, and the tied product is the AAMCO transmission repair kit and parts. AAMCO urges this court to hold that a trademark may not serve as the tying product. Two circuits, though, persuaded by Justice Lumbard's views in dissent in *Susser v. Carvel Corp.,* 332 F.2d 505 (2nd Cir. 1964), have held that a trademark can be a tying item separate and distinct from items to be used in the operation of the trademarked franchise. *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (5th Cir. 1972); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir. 1971). This court elects to follow the position of those circuits.

The lengthy rationale for this position, enunciated by Judge Merrill in the *Siegel* case, is worth repeating:

The historical conception of a trademark as a strict emblem of source of the product to which it attaches has largely been abandoned. The burgeoning business of franchising has made trade-mark licensing a widespread commercial practice and has resulted in the development of a new rationale for trade-marks as representations of product quality. This is particularly true in the case of a franchise system set up not to distribute the trademarked goods of the franchisor, but, as here, to conduct a certain business under a common trade-mark or trade name. Under such a type of franchise, the trademark simply reflects the goodwill and quality standards of the enterprise which it identifies. As long as the system of operation of the franchisees lives up to those quality standards and remains as represented by the mark so that the public is not misled, neither the protection afforded the trade-mark by law nor the value of the trade-mark to the licensee depends upon the source of the components.

This being so, it is apparent that the goodwill of the Chicken Delight trademark does not attach to the multitude of separate articles used in the operation of the licensed system or in the production of its end product. It is not what is used, but how it is used and what results that have given the system and its end prod-

uct their entitlement to trade-mark protection. It is to the system and the end product that the public looks with the confidence that established goodwill has created.

Thus, sale of a franchise license, with the attendant rights to operate a business in the prescribed manner and to benefit from the goodwill of the trade name, in no way requires the forced sale by the franchisor of some or all of the component articles. Just as the quality of a copyrighted creation cannot by a tie-in be appropriated by a creation to which the copyright does not relate, *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948), so here attempts by tie-in to extend the trade-mark protection to common articles (which the public does not and has no reason to connect with the trade-mark) simply because they are said to be essential to production of that which is the subject of the trade-mark, cannot escape antitrust scrutiny.

The requirement of sufficient economic or market power over the tying item is not a difficult one to meet in the case at bar. In *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, at 502–504, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969), it is stated:

> The standard of "sufficient economic power" does not, as the District Court held, require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market.
>
> . . . Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.

Essentially, the court seems to be saying that if one has imposed a tie, one had sufficient economic power to do so. See, *AAMCO v. Tayloe,* 1975—2 Trade Cases, ¶ 60,666. In any event, the requisite power is presumed to exist where the tying product is patented or copyrighted. *United States v. Loew's, Inc.*, 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 1 (1962). This presumption was extended to trademarks in the *Siegel* and *Warriner Hermetics* cases, and the same presumption is applicable here. AAMCO is a nationwide business whose name is well known in the field of automotive transmissions. Where the owner of a well known and uniquely desirable trade-mark imposes a tie on its franchises, the element of economic power required by *Fortner Enterprises* is met. The very fact that AAMCO, prior to 1969, had imposed a tie on its many franchises evidences the power to have done so. That alone seems to meet the standard enunciated in *Fortner Enterprises*.

More than an insubstantial amount of commerce is affected by this claimed tie-in arrangement.

> The requirement that a "not insubstantial" amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie . . . . But normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely de minimis, is foreclosed to competitors by the tie.

*Fortner Enterprises, Inc. v. United States Steel Corp., supra,* 394 U.S. at 501, 89 S.Ct. at 1257. In *Fortner Enterprises,* the court stated that $190,000 was not insubstantial but in any event, "the relevant figure is the total volume of sales tied by the sales policy under challenge . . . ." *Id.* at 502, 89 S.Ct. at 1258. Evidence submitted by AAMCO shows that the plaintiffs purchased at least $40,000 worth of repair parts from AAMCO in the fiscal years 1971–1973. (AAMCO Post Trial Brief, Table A). Such amount does not encompass the total dollar value of repair parts pur-

chased by plaintiffs from AAMCO during the relevant damage period, as the entire damage period runs from November 1969 to November 1973. But even the $40,000 worth of parts purchased by plaintiffs cannot be deemed "insubstantial" under *Fortner Enterprises* analysis. This court therefore follows the holding in *AAMCO v. Tayloe, supra,* where Judge VanArtsdalen concluded that $50,000 worth of parts purchased from AAMCO could not be "considered insignificant in *Fortner Enterprises* terms." *Id.* at ¶ 67,916.

Having concluded, *as a matter of law,* that plaintiffs' allegation could support a claim of per se illegality, this court concludes, *as a matter of fact,* that plaintiffs have fallen short of proving coercion in their tie-in claim.

 In order to establish an illegal tying arrangement arising from business conduct rather than express contract, franchisees must prove that they were coerced, not merely persuaded, into purchasing the products at issue here. See *Ford Motor Co. v. United States,* 335 U.S. 303, at 316–320, 69 S.Ct. 93, 93 L.Ed. 24 (1948); *Abercrombie v. Lum's, Inc.,* 345 F.Supp. 387, at 391 (S.D.Fla.1972). As the court stated in *American Manufacturers Mutual Insurance Co. v. ABC–Paramount Theatres,* 446 F.2d 1131, at 1137 (2d Cir. 1971):

> There can be no illegal tie unless unlawful coercion by the seller influences the buyer's choice.

Coercion has been held to constitute more than merely aggressive salesmanship. *Davis v. Marathon Oil,* 528 F.2d 395 (6th Cir. 1975); *N. W. Controls, Inc. v. Outboard Marine Corporation,* 333 F.Supp. 493 (D.C. Del.1971). In *Davis,* the Sixth Circuit was not concerned that the Marathon sales representative told plaintiff his lease might be cancelled if he did not purchase more supplies from Marathon Oil Company. The crux of the Sixth Circuit's conclusion was that scattered threats were not enough to prove coercion. The most that could be said for plaintiff's proofs is that Marathon Oil utilized "aggressive salesmen who were in-

terested in increasing their sales of Marathon TBA." In the *N. W. Controls* case plaintiffs also presented evidence of threats of franchise cancellation toward those plaintiffs who did not use the O.M.C. control box and cable with the O.M.C. engine. Again, though, the court had no difficulty concluding that plaintiffs' recitations of pressures being exerted "does not show coercion but only normal sales . . . 'pressure [to] buy O.M.C.'s line.'" *Id.* at 513.

An admittedly fine line exists between influence, persuasion and aggressive salesmanship on the one hand, and coercion on the other. *Ungar v. Dunkin Donuts of America,* 531 F.2d 1211, at 1226 (3d Cir. 1976). The Third Circuit, when faced with this problem in *Ungar,* concluded:

> We are the first to admit that there can be no bright line distinguishing influence, persuasion, and aggressive salesmanship on the one hand, from coercion, on the other. But it is difficult to conceptualize a more damning denunciation of the private free enterprise system than the thesis that there is no distinction where there is an unequal relationship between buyer and seller. The purpose of the antitrust laws is to stimulate economic competition, the essence of which is the presence of many competing sellers; salesmanship—the art of persuasion and influence—is inherent in competition among sellers. It is only when the buyer's freedom to choose a given product is restricted that the tying doctrine comes into play; so long as 'the buyer is free to take either product by itself there is no tying problem.' [Citation omitted.]

 In the case at bar, plaintiffs claim that even though they were free under the terms of their Franchise Agreements to procure transmission repair parts from other certified vendors, they were still "coerced" into buying their parts from AAMCO. But in drawing the line between aggressive salesmanship and "coercion," this court, after reviewing the evidence, is satisfied that none of the plaintiffs have succeeded in establishing by a preponder-

ance of the evidence that they were coerced into purchasing more AAMCO parts than they would otherwise have purchased absent the alleged pressure. Since proof of individual coercion must vary from franchisee to franchisee, *Abercrombie v. Lum's, Inc., supra,* at 391, the court will examine each plaintiff's claim individually.

Initially, though, the court notes a critical defect in the totality of plaintiffs' proofs of coercion. According to plaintiffs, AAMCO used its parts salesmen as the primary vehicle for implementing the scheme of coercion. Each of the plaintiffs testified that the AAMCO parts salesmen would tie up the phone lines and regularly harass them about increasing their AAMCO parts purchases. The three relevant AAMCO parts salesmen for the greater Detroit area from 1970–1973 were:

(1) Jerry Romm pre-March, 1971
(2) Marc Brittner March, 1971—1972
(3) Robert Cochran January, 1973—November, 1973

Interestingly, not a single plaintiff could identify the Detroit AAMCO parts salesman for 1973, Mr. Robert Cochran (Smith—Tr at 247; Prior—Tr at 328; Layman—Tr at 465; Stewart—Tr at 537; Folino—Tr at 702). It is inconceivable that Mr. Cochran could have been the tool for implementation of the scheme of coercion alleged by the plaintiffs. Robert Cochran was trained by his predecessor, Marc Brittner, and it was his duty to call the plaintiff AAMCO Detroit dealers each week during 1973 in an effort to sell them AAMCO transmission repair parts. Mr. Cochran testified that he never threatened or pressured any of them. Additionally, plaintiffs' counsel did not put a single question to Mr. Cochran by way of cross-examination.

No plaintiff had any complaint about the way he was treated or handled by Marc Brittner, either. Brittner was a consummate salesman (Folino—Tr at 710) who didn't pressure or threaten anyone (Folino—Tr at 707; Prior—Tr at 328–329; Layman—Tr at 465). Although Smith contended Brittner did make some demands on him, Smith admitted that Marc Brittner never got Smith to increase his parts purchases from AAMCO (Smith—Tr at 250–251).

The record reveals that from the time that Marc Brittner was first assigned to handle this entire group of AAMCO dealers as their parts salesman—March, 1971, according to AAMCO Exhibit 315, until these AAMCO dealers notified AAMCO that they were terminating their contracts on November 29, 1973, according to joint Exhibit 22—there is no proof that either Brittner nor Cochran engaged in any coercive tactics resulting in an increase in plaintiffs' AAMCO parts purchases.

It is with Jerry Romm and his conduct prior to March, 1971, upon which plaintiffs base the large majority of their claims that AAMCO engaged in coercion. Folino considered Romm a "screamer and a cusser." (Folino—Tr at 622). Stewart testified that Romm threatened "to have my ass" over too insubstantial a parts purchase (Stewart —Tr at 502). Prior claimed that Romm was able "to make life tough if you didn't buy parts from them." (Prior—Tr at 301).

The record reveals that Romm was aggressive. But the record also reveals that when the Detroit AAMCO dealers wrote to AAMCO's Director of Operations on February 16, 1971 to complain of Romm's "misapplication of reasonable sales techniques," Romm was immediately removed as the Parts Representative for the Greater Detroit area. (AAMCO Exhibits 314 and 315).

Plaintiffs have contended that Romm's conduct pressured them into buying more AAMCO parts than otherwise would have been purchased during Romm's tenure as Parts Representative. But when Luther Smith wrote to AAMCO's Director of Operations to complain about Romm, Smith purported to speak for the entire Detroit AAMCO Dealers Association:

> We feel that [Romm's] attitude, demeanor and misapplication of reasonable sales techniques are actually driving our people into grim determinations *not* to buy from AAMCO. . . . We sincerely believe a reasonable parts representative will immediately increase our purchase volume. [Emphasis in original.] (AAMCO Exhibit 314).

Such an admission refutes plaintiffs' claims that Jerry Romm was able to successfully coerce them into buying from AAMCO.

What the record shows, on the contrary, is that during all the years at issue, and especially during 1972 and 1973, plaintiffs purchased extensively from other sources and also from AAMCO, but in amounts that are in extremely small proportions to the total amounts spent for repair parts and supplies. It is significant that of the more than $600,000 in total parts purchases made by plaintiffs for the entire damage period, plaintiffs by their own calculations claim only $10,500 in damages for price overcharge. (AAMCO Post Trial Brief, Table A). Such a figure reflects the limited amount of parts purchased from AAMCO during the damage period as well as reflecting upon the lack of success AAMCO had in "coercing" its Detroit dealers to increase their parts purchases. No plaintiff in any four-month period during 1971–1973 ever purchased more than 8 percent of his repair parts and supplies from AAMCO. Not only that, plaintiffs' best evidence offered as proof of AAMCO's attempted coercion predates the damage period. The court was willing to accept such evidence as it reflected the alleged strained relationship between the plaintiffs and AAMCO. But the court cannot utilize such evidence to prove coercion from November, 1969 to November, 1973. The net result is that AAMCO's disenfranchisement in July, 1968 of plaintiff McAlpine for failure to utilize AAMCO parts kits, and AAMCO's March, 1969 listing of McAlpine in the *Twin Post* as a dealer ineligible to receive incentive awards was not considered by this court as bearing upon AAMCO's attempted coercion *during the damage period.* (Plaintiffs' Exhibits 4 and 7). Any parts tie-in damage claim resulting from AAMCO conduct prior to November, 1969 merged in the earlier settlement between plaintiffs and AAMCO.

Thus, with this background, the court will examine each plaintiff's individual claim that he was coerced into buying AAMCO parts between November, 1969 and November, 1973.

Plaintiff McAlpine has alleged that constant pressure was placed on him to buy AAMCO parts during the entire damage period—from November, 1969 when AAMCO entered into a Consent Judgment with its Detroit dealers to November, 1973 when those Detroit dealers terminated their AAMCO Franchise Agreements (McAlpine —Tr at 48). Following the 1969 Consent Judgment, McAlpine testified that AAMCO's "tactics change but . . . the pressure was there, as much or more to buy parts" (McAlpine—Tr at 48). Under the 1969 Consent Judgment the Detroit AAMCO dealers could purchase parts from outside sources. But according to McAlpine, the paperwork required by AAMCO for a dealer to purchase outside parts was burdensome enough as to make such purchases inefficient (McAlpine—Tr at 47). As further proof of AAMCO's attempts at coercion McAlpine cited a single 1971 instance when AAMCO represented to its dealers that failure to use an AAMCO parts kit for a repair job might constitute a deceptive practice in violation of an FTC Consent Order (McAlpine—Tr at 49). Significantly, however, McAlpine did not furnish the court with any other evidence of post-1969 coercion directed toward him. When asked on cross-examination what pressure tactics, if any, AAMCO directed toward him between 1970 and 1973, McAlpine could cite none (McAlpine—Tr at 73–78). McAlpine could only say that he was "asked" to buy more parts and was told that he was setting "a bad image" (McAlpine—Tr at 78). McAlpine, after having alleged he was subjected to continual harassment, admitted on cross-examination to an absence of any coercive instances beyond those already mentioned (McAlpine—Tr at 80). Such a record cannot support McAlpine's claim of coercion.

Instead, the record with respect to McAlpine is conspicuous by its absence of coercive practices by AAMCO during the damage period. McAlpine could cite only one instance in either 1969 or 1970 when he placed an AAMCO parts order (McAlpine— Tr at 69). Any attempt by AAMCO to coerce McAlpine into making parts purchas-

es during that period was obviously ineffective. Only when prices were reduced across the board by AAMCO in 1972 did McAlpine purchase more parts from AAMCO, and then on a selective basis when his business judgment determined AAMCO parts to be of acceptable price and quality. The record reflects that McAlpine resumed purchasing AAMCO parts only after the prices for those parts had become competitive, and not in response to pressures from AAMCO salesmen. In claiming no damages for price overcharge in the entire year 1973 (Plaintiffs' Exhibit 22), McAlpine acknowledges that AAMCO parts prices had become competitive, if not cheaper, than outside parts prices.

Each of the other plaintiffs have similarly failed to convince the court that they were coerced into purchasing AAMCO transmission repair parts. Joseph Stolaruk, who also claims no damages for the entire year 1973, testified that he personally never received pressure from parts salesmen (Stolaruk—Tr at 219). Stolaruk was merely asked by the AAMCO parts salesman to give parts orders. Such was the extent of his testimony on individual coercion directed toward him.

John Folino, on the other hand, testified that AAMCO continually pressured him to buy AAMCO parts during the 1970–1973 damage period. According to Folino, this pressure was heaviest prior to March, 1971 when Jerry Romm was the AAMCO parts salesman for the greater Detroit area. Folino testified that Romm was "a screamer and a cusser" who pressured him over the telephone to buy parts. Folino also recounted an incident where AAMCO told its dealers that in order to keep from violating an FTC order the dealers had better use AAMCO parts kits. But Folino could cite no instance between 1970 and 1973 when he was threatened for refusing to buy parts from an AAMCO salesman (Folino—Tr at 705–707). Folino admitted that he purchased extensively from local suppliers (Folino—Tr at 703–704, 714); that he regularly refused solicitations of parts orders from AAMCO salesmen (Folino—Tr at 714); and most significantly that he could not remember if he bought more parts in response to AAMCO pressures (Folino—Tr at 619).

According to his own testimony (Folino—Tr at 712), Folino purchased nearly $80,000 of repair parts from all sources during the years 1971 and 1972. Only $6,000 of that amount was spent on AAMCO parts. Such a fact demonstrates that AAMCO's attempts to sell Folino its parts was at most only minimally successful even though AAMCO prices were now competitive and admittedly of the same quality as outside parts (Folino—Tr at 637–638; Plaintiffs' Exhibit 22). It is also significant that Folino purchased only $2,100 worth of parts from AAMCO in 1970, a year in which AAMCO prices were markedly higher than the prices of its competitors (Plaintiffs' Exhibit 22). The inference to be drawn is that Folino's purchasing habits were consistent throughout the damage period. He purchased sporadically from AAMCO when AAMCO kits suited his needs. Nothing AAMCO could do affected Folino's decision to buy from whomever he pleased. Upon such facts, this court cannot conclude that AAMCO, as alleged, forced Folino to buy from them in order "to keep the wolves away from the door" (Folino—Tr at 613).

Aaron Reavis testified that he increased his parts purchases from AAMCO during the damage period (Reavis—Tr at 414). But like Folino, Reavis was unable to demonstrate that the increase resulted from anything other than a business decision. Reavis admitted that the kit system was a good system, being more convenient than a system of individual parts purchases. (Reavis—Tr at 416). Reavis could not recall ever being threatened by AAMCO for not buying AAMCO parts (Reavis—Tr at 415). In fact, the record reveals that the only reason Reavis did not buy *exclusively* from AAMCO was his pique at the aggressive AAMCO salesmen who were constantly soliciting him for parts purchases (Reavis—Tr at 418). The net result of Reavis' testimony was to convince the court that when Reavis felt pressured by AAMCO, he bought less, not more. Reavis, too, admitted that he used local supplies extensively (Reavis—Tr at 421–422).

Layman and Stewart operated a center in Warren, Michigan for the four years, 1970 through 1973, and in Clawson, Michigan for two years, 1971 and 1973. (Stewart—Tr at 539–540; AAMCO Post-Trial Brief, Table A). Layman admitted that he bought most of his repair parts from other suppliers during the damage years 1970 through 1973 (Layman—Tr at 467). When asked to recount any instance of a coercive threat directed at him by AAMCO for not purchasing more AAMCO parts, Layman could not remember (Layman—Tr at 457). He testified that he took a hint from AAMCO's threatened conduct toward other recalcitrant Detroit dealers (Layman—Tr at 439) and that he was harassed by "abrasive type people" who always wanted a "bigger parts order" (Layman—Tr at 457–458). Although Layman claimed that he was "buying parts from AAMCO only to the extent that we had to try to keep them off our back" (Layman—Tr at 440), his partner Donald Stewart testified that in response to calls he considered to be "harassment," he *did not* increase his parts purchases (Stewart—Tr at 524–525). If Stewart could find parts cheaper from outside dealers, he would buy them (Stewart—Tr at 536). The record reflects that in their Clawson center during the damage period, they bought $83,000 worth of transmission repair parts from all suppliers, but less than $8,000 of that was spent on AAMCO parts (Plaintiffs' Exhibit 22).

Stewart did recount an incident, in 1971 with AAMCO parts salesman Jerry Romm where Romm threatened "to have my ass" unless Stewart returned to using AAMCO parts kits exclusively in his Warren center (Stewart—Tr at 501–502). But of the subsequent $64,000 in total parts purchased for the Warren center in 1972 and 1973, Layman and Stewart bought only $4,300 worth of AAMCO parts (Plaintiffs' Exhibit 22). The net result of such attempted pressure is that it was ignored. Both *Davis v. Marathon Oil, supra,* and *N. W. Control, Inc. v. Outboard Marine Corporation, supra,* involved similar instances of salesmen making scattered threats against franchisees. Judge McCree commented in *Davis* on four incidents of threats relied upon by appellant to prove his tie-in claim against Marathon Oil Company:

> The most that can be said for appellant's proofs is that they show that Day and Burocker were aggressive salesmen who were interested in increasing their sales of Marathon TBA.

Similarly, this court concludes that Layman and Stewart have made out a case for harassment; but harassment which is ignored is evidentiary of aggressive salesmanship, not unlawful coercion.

Plaintiff Luther Smith contended that he responded to harassment from AAMCO by increasing his parts purchases (Smith—Tr at 240). But while Smith stated that he increased his purchases, the record proves otherwise. Smith assumed responsibility for the operation of his father's three Detroit AAMCO shops upon his father's death in 1972. At that time, his father was purchasing 7.6% of his repair parts from AAMCO for his Conant center, 3.3% of his repair parts from AAMCO for his Livernois center, and 1.7% of his repair parts from AAMCO for his Gratiot center (AAMCO Exhibit 70; Table D of Post-Trial Brief). Within months after Smith, Jr. took over operations, he was purchasing 6.6% of his repair parts from AAMCO for the Conant center, 1.7% of his repair parts from AAMCO for the Livernois center, and 0.6% of his repair parts from AAMCO for the Gratiot center. By the middle of 1973, Smith, Jr.'s purchases from AAMCO for his three centers had dwindled to 0.1%, 1.3%, and 0.7% of his total parts purchases. Such a radical decline in his AAMCO parts purchases cannot support Smith's claim of coercion. On the contrary, at a time when AAMCO parts had become competitively priced and were of comparable quality, Smith's purchasing pattern reveals absolute refusal to give into whatever pressures AAMCO did exert.

John Prior testified that AAMCO salesmen would tie up his telephone lines with harassing calls until he, unlike Smith, would give in by agreeing to a bigger parts order (Prior—Tr at 296). Prior also testified that AAMCO threatened him with disenfran-

chisement (Prior—Tr at 296–297) for not buying enough parts. But when asked how he responded to this alleged harassment, Prior responded, "Sometimes I'd buy a few parts from them, sometimes I'd tell them to go to hell." (Prior—Tr at 301). Prior's purchasing pattern throughout the damage period reflects this ability to be his own boss. In 1971, at a time when AAMCO prices were consistently higher than outside parts prices, Prior purchased $5,500 worth of AAMCO parts. In 1972, after AAMCO had reduced its prices across the board, Prior purchased $3,000 in AAMCO parts. Such a record is inconsistent with Prior's testimony that he increased his parts orders in response to AAMCO's constant pressure. (See Prior—Tr at 296).

In fact, on cross-examination, when asked how frequently AAMCO called to harass him about parts purchases, Prior's response was only that "it happened more than once," not that it happened frequently (Prior—Tr at 313). Although to Prior, such conduct was "frequently enough for me," (Prior—Tr at 313) a few scattered instances of sales pressure are not enough to make out a tie-in claim of coercion. *See, Ford Motor Co. v. United States,* 335 U.S. 303, at 316–320, 69 S.Ct. 93, 93 L.Ed. 24 (1948).

Taking the plaintiffs' contentions as a whole, it is clear that they all felt harassed and frustrated in their inability to be free from AAMCO's calls. But the record does not support their claims of actionable coercion. Many possible reasons exist other than AAMCO's coercion that could explain why the plaintiffs were willing to purchase AAMCO kits that part-by-part were more expensive than parts purchased on the open market. Many of the plaintiffs testified to the bookkeeping convenience of ordering AAMCO kits. AAMCO's assembly sets also had the unique advantage of permitting uniformity and control in rebuilding, as well as time-saving (testimony of AAMCO dealers Bruce McDonald and Kenneth Thompson). With respect to purchasing practices and inventory, the use of assembly sets—including multi-year coverage assembly sets—allowed for space and cash savings

(McDonald testimony). Even plaintiffs' expert witness, Frank Regan, had to admit that if one were to use bulk inventory, the rebuilding process would be more time consuming than if one used assembly sets.

AAMCO has always contended that its assembly sets were the most complete, and this assertion was never refuted. The only attack mounted on the AAMCO practice of using assembly sets was the argument that they contained "extra parts." It was conceded by plaintiffs in their Pre-Trial Brief (page 11) that these extra parts were so miniscule that the cost associated with them could not even be calculated. AAMCO's witness, Bruce McDonald, did testify that these parts were small in number, low in price, and were easily used for other purposes if not returned to AAMCO for credit.

The court believes that the assembly of these parts into a single package entitled AAMCO to some price differential. This price differential was justified by the convenience with which an AAMCO franchisee had his builders save time, the convenience which was afforded in the lesser inventory space requirement, and the perhaps even measurable financial advantage due to a reduced need for an investment of cash in inventory. (See, McDonald testimony.)

For all the above-mentioned reasons, this court concludes that AAMCO did not impose an illegal tie-in arrangement upon its Detroit franchisees between 1970 and 1973 when AAMCO gave those franchisees a license to use the AAMCO trademark.

## B. BREACH OF CONTRACT:

On November 29, 1973, each plaintiff signed identical letters of termination (Stipulation of Facts, ¶ 52) and in concert with all the others unilaterally terminated his Franchise Agreement (AAMCO Exhibits 1–27). The identical letters read:

This is your official notice that I am terminating my relationship with AAMCO Automatic Transmissions, Inc., effective December 15, 1973.

This decision was necessitated by your continual failure to live up to the terms of your Franchise Agreement. I do not

feel that you have ever made good on the promises which were made to me and, therefore, I am now telling you that, as far as I am concerned, the franchise was broken by you long ago.

AAMCO claims that the termination of Franchise Agreements by the plaintiffs was a breach of contract entitling AAMCO to damages in lost royalties and in the cost of re-establishing itself in the Detroit market. AAMCO's contention is that there was no justifiable grievance or group of grievances which allowed plaintiffs to terminate their Franchise Agreements. According to AAMCO, AAMCO was so taken with surprise by the sudden mass exodus of its Detroit franchisees that as late as November 20, 1973, no one at AAMCO had any hint or suspicion that the situation in Detroit was even volatile.

The plaintiffs have painted a totally different picture. It is a picture fraught with AAMCO's alleged arrogance and AAMCO's continual refusal to live up to its promise of good faith in helping its licensees achieve success. The contention running through this allegation is that AAMCO breached its Franchise Agreements every year of its existence. The franchisees insist that they constantly tried to make their agreements work, for they saw benefits to be derived from an association with 'AAMCO. But, after years of disputes including litigation and settlements with AAMCO, the Detroit franchisees felt a need and a right to finally tell AAMCO, "Enough." On November 29, 1973, the plaintiffs officially terminated their association with AAMCO.

Whether the termination of their Franchise Agreements was justifiable or whether such termination amounted to a breach of contracts depends upon whether AAMCO's conduct prior to November 29, 1973 violated the terms of the relationship, giving the plaintiffs the right to terminate. The plaintiffs claim that two policies of AAMCO constituted breach of contract by AAMCO, entitling them to terminate:

(1) *Antitrust Defense:*
the imposition upon these franchisees of illegal extortive exactions via parts tie-in arrangement.

(2) *Marketing Defense:*
the mid-1973 AAMCO announcement that AAMCO was going to add dealers to the Detroit market without geographic spacing provisions.

This court has already rejected the antitrust defense in concluding that AAMCO was not guilty of illegal tying practices. The success of AAMCO's claim for breach of contract thus must rise or fall upon the court's conclusions with respect to plaintiffs' marketing defense.

Each of the Franchise Agreements between AAMCO and the plaintiffs contains the following language:

AAMCO, through its intimate knowledge of the automatic transmission business, has developed methods and techniques for the profitable operation of shops devoted exclusively to the repair of automatic transmissions. . . .

Licensee desires to enter into the business of operating an AAMCO automatic transmission repair shop.

*In order to assist an authorized AAMCO licensee to get started in business and to achieve maximum results, AAMCO makes available to all licensees advice, information, experience, guidance and know-how with respect to management, financing, merchandising and service in the AAMCO shops, and AAMCO employs various other means to assist the authorized AAMCO licensees to achieve success in their businesses.*

In consideration of the foregoing and of the mutual agreements contained herein, AAMCO and Licensee agree as follows . . . : (Emphasis added).

The Franchise Agreements reveal that in consideration of its right to receive a dealer franchise fee—generally 7 percent of franchise sales (Franchise Agreements, p. 2)—AAMCO has granted its dealers two corresponding legal rights:

(1) a license to use the AAMCO trademark, and

(2) the right to expect AAMCO's help in achieving franchise success.

This latter right established a duty in AAMCO not to hinder the licensee's ability to achieve operational success. If AAMCO at any time were to fail to honor this commitment, such failure would constitute a breach of contract—either an immaterial breach or a material breach. A material breach would allow the franchisees to terminate their Franchise Agreements and discontinue future performance. An immaterial breach would allow the franchisees to sue for any damage caused, but they would still be bound to continue performance under the contract. *Borough of Greentree to Use of Castelli Construction Co. v. Torterete,* 205 Pa.Super. 532, 211 A.2d 76 (1965).

The plaintiffs contend that AAMCO materially breached its Franchise Agreements with the mid-1973 announcement of an expansion plan to add 9 new AAMCO franchises to the Detroit market (AAMCO Exhibit 101). Such a plan, according to the plaintiffs, was without spacing provisions and would so severely have cut into individual franchisee profits that existing franchisees would have no hope of earning a future livelihood. The plaintiffs believe that AAMCO's conduct was in such callous disregard of AAMCO's commitment to help its licensees achieve success that a material breach of contract was accomplished.

There is case law for the proposition that a franchisor who adds franchises to an already saturated market without utilizing geographic spacing provisions has engaged in tortious conduct. *Photovest v. Fotomat,* 1977–1 Trade Cases, ¶ 61,529 (S.D.Ind.1977). Such conduct violates a promise of good faith and fair dealing by the franchisor who owes a duty not to intentionally destroy the right of the existing franchisee to enjoy the fruits of the contract. In the *Photovest* case the court noted how over-saturation of a market could be profitable to the franchisor even though such conduct reduced the sales volume per franchised store and even produced losing stores. The court in *Photovest* concluded:

> Defendant has breached the implied covenant of good faith and fair dealing in its agreements with the plaintiff by:

(a) its saturation of the Marion County market area with company-owned stores, including the placement of numerous company stores in the market areas of franchised stores. . . .

■ AAMCO contends that the plaintiffs have no standing to complain about dealer spacing since franchisees who attempt to limit, control or otherwise restrain a franchisor from increasing the number of its franchises in a given market are engaged in an unlawful conspiracy to restrain trade. (*See United States v. Topco Associates,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515). But antitrust analysis is not helpful to the resolution of the contractual dispute now before this court. The fact that franchisees cannot conspire to allocate territories among themselves is not relevant when the issue is the conduct of the franchisor. A franchisor who allocates its franchises in a given market, would not thereby come under antitrust scrutiny for it is not possible for one to conspire with one's self. The franchisors' duty in this regard is only to ensure that it does nothing to impair each franchisee's contractual rights.

■ The court has made an exhaustive review of AAMCO's marketing conduct with respect to existing, prior and proposed dealer spacing programs in November, 1973. The court has determined that AAMCO's conduct in 1973 was not egregious enough to justify the plaintiffs' termination of their Franchise Agreements. A complete chronology of the record supports this conclusion:

In 1968, the Detroit AAMCO dealers first expressed dissatisfaction with AAMCO's marketing program. During that time period, AAMCO carried on a series of conversations with the Detroit dealer group and was told that the dealers themselves believed that the Detroit market could accommodate up to 20 AAMCO shops—more than even AAMCO believed—so long as careful attention was given to dealer placement (McAlpine—Tr at 55). Clearly there was never a dispute about adding dealers to Detroit—only a concern that the geographic placement of new AAMCO centers be such

that they not cannibalize each other. In McAlpine's own words, "I didn't say addition of dealers [was a problem]; I said addition of dealers without any proper spacing or any geographical area where you could make a living. You should have space to make a living. That's what I'm talking about" (McAlpine—Tr at 55).

Harold Stanley, who was then Vice-President of AAMCO, gave McAlpine the responsibility of working out an expansion plan with spacing considerations to be involved. Notwithstanding the fact that the Detroit dealers worked out a proposed plan, within two months AAMCO opened up a new shop less than 5 miles between McAlpine's Plymouth Road center and John Folino's center in Garden City (McAlpine—Tr at 56). McAlpine testified that his business went down 25 percent (McAlpine—Tr at 56). Folino testified that he lost "over a thousand dollars a week . . . 15 or 20 percent of my business" (Folino—Tr at 618), and Aaron Reavis whose shop was the new shop in question, testified that he lost money every year except one "when I just barely got in the black" (Reavis—Tr at 386).

Nor was Aaron Reavis' the only new AAMCO shop added to Detroit in 1969 which was located in close proximity to existing dealers. Thirty days after the Reavis shop opened, AAMCO opened another shop at Seven Mile and VanDyke, right in the center of the triangle of three existing centers. One of the existing centers was within 2 miles of the new shop, and none of the other centers was more than four miles away (McAlpine—Tr at 57). The new shop never got off the ground, and AAMCO finally closed it. But while the new shop was open, it cut into the business of the existing shops without creating new business (McAlpine—Tr at 57).

Later in 1969, John Prior suffered an injury similar to McAlpine and Folino when AAMCO put two dealers within 4 miles of his Groesbeck Highway center in Warren. Prior testified that his gross sales were cut nearly in half (Prior—Tr at 302–303). Such new shops never made enough money to even pay their share of the Detroit dealer group advertising. Instead, the new shop leached onto the advertising expenditures of the existing dealers (McAlpine—Tr at 57; Folino—Tr at 619) while taking their business away at the same time.

Joseph Stolaruk, who was co-owner with Folino in the Garden City center, and Donald Stewart, who operated a center near the Prior center in Warren, spoke for the feelings in 1969 of all the plaintiffs:

By putting a shop so close to us to take our livelihood away from us or the volume of business was the most crucial thing in comparison that AAMCO could have done to us (Stolaruk—Tr at 212.) AAMCO promised in the contract to use their expertise and knowhow to help me achieve success and to increase my volume of business. Now, if you bring a dealer into the Detroit area and you don't have any plan as to where you're going to put them, then I'm going to wind up handing a great deal of my business to this new dealer that's brought in. . . If they put a new shop between my two existing shops they were going to ruin both my locations (Stewart—Tr at 503).

But this court need not consider whether AAMCO's conduct in 1969 breached AAMCO's duty of good faith "to assist the authorized AAMCO licensees to achieve success in their businesses" (AAMCO Franchise Agreement, page 1). If there was a breach which excused the plaintiffs from further performance under their Franchise Agreements in 1969, the plaintiffs effectively utilized their power of election to proceed under their Franchise Agreements. Pennsylvania law—which by contract is controlling in any suit between AAMCO and its franchisees (Franchise Agreement, page 5, ¶ 23)—states that a party who discovers facts which would warrant rescission of a contract must act promptly. If the party elects to rescind, it is the party's duty to notify the breaching party within a reasonable time. *Fichera v. Gording,* 424 Pa. 404, 227 A.2d 642 (1967). A party who continues to work under a Pennsylvania contract after the other party has breached

thereby waives the right to rescind *Pennsylvania Law Encyclopedia,* Volume 8, § 366, at 417. An election to continue performance does not constitute a waiver of the right to damages for a breach. But the failure of the Detroit dealers to assert a right to damages within a reasonable time after the breach constituted a release of whatever damage rights then existed.

Two reasons exist which would explain why the plaintiffs did not elect either to terminate their contracts in 1969 or to sue for damages. First, AAMCO in 1969 established their "five mile" policy which set a minimum five mile limit distance between AAMCO centers. (Tr at 337). Although Donald Layman testified that he did not think five miles was enough (Layman—Tr at 469), this appeasement gesture by AAMCO effectively prevented AAMCO from opening centers similar to the centers that had created havoc in 1969. Second, the plaintiffs recognized that there were many benefits to be gained from continuing as AAMCO franchisees. Folino recognized that:

> The dealer training program was good. The national advertising program I felt helped business a great deal . . .. I bought shops when I could and I advised others to get into the business. I thought that the problems would, you know, eventually be straightened out (Folino—Tr at 632).

Folino and McAlpine had enough faith in the future growth of AAMCO to purchase an additional franchise in 1972 (Folino—Tr at 627), as did Stewart and Layman. (Joint Exhibit 9).

Folino recounted an incident in 1972 where AAMCO was planning on opening a shop within three blocks of his *proposed* Farmington site. But Folino admitted that AAMCO could not be in violation of its "five mile" policy until his proposed shop was in operation (Folino—Tr at 692). Furthermore, the competing AAMCO shop did not open (Folino—Tr at 627).

Thus, at no time during the years 1969 until the Detroit dealers became dissatisfied with AAMCO's marketing program in 1973 did AAMCO fail to honor its five mile policy. The plaintiffs eventually stipulated that "we do not contend that from the additional dealers being added in 1968 and 1969 to mid-1973 that there was any violation of anybody's rights with respect to dealer placement as a basis for our position in this lawsuit" (Tr at 692–693). In fact, in 1973, prior to the series of events in the Fall, there was no discussion of leaving AAMCO for any reason. (McAlpine—Tr at 107; Smith—Tr at 267; Adams—Tr at 365; Schlacter Dep. at 9).

With respect to what happened during the months of September through November, 1973, there are two conflicting interpretations: one, according to the plaintiffs is that AAMCO in July, 1973 had decided to embark upon a major plan of expansion without consulting its dealers. This nationwide marketing program, according to the plaintiffs, had no arrangements for a plan that would locate new dealers in centers that would not cut into the business of the existing dealers. AAMCO's plan was simply to add 9 additional centers to the Detroit market (AAMCO Exhibit 101). With AAMCO's 1969 Detroit expansion program still in their minds, the plaintiffs felt they either had to leave AAMCO or run the risk of being driven out of business. They chose to leave.

AAMCO does not dispute that their franchise market recommendation of July, 1973 (AAMCO Exhibit 101) established a plan of expansion calling for 9 additional centers to be added to Detroit. AAMCO contends, though, that beginning on October 2, 1973, and culminating on November 20, 1973, that AAMCO had a chance to meet with its dealers and receive their feelings on the plan of expansion. What eventually emerged on November 20 was a definitive expansion plan in which AAMCO decided not to locate additional AAMCO centers in Detroit during 1974, 1975, or 1976. (AAMCO Exhibit 109). Not until 1977 would the Detroit market be available for the opening of new centers.

The record verifies AAMCO's position. Sidney Hurley, Vice-President of the Na-

tional AAMCO Dealers Association in 1973, testified that dealers from all of the major markets were upset when AAMCO released its initial expansion plans in July, 1973. The object of contention was AAMCO's failure to have a plan for locating the new dealers so that they would not eat into the business of the existing dealers. Dealer response to AAMCO's plan was sufficiently negative so that on October 2, 1973, AAMCO requested an emergency meeting with its Dealers' Association, of which William McAlpine was President. (AAMCO Exhibit 103). Gerald Shine, General Counsel for the National AAMCO Dealers Association, represented the Association at this meeting with AAMCO management.

At the meeting, which was held on October 2, 1973, AAMCO announced that its July plan of expansion was now obsolete. In its place AAMCO was intending to put a moratorium on future expansion until a new marketing program could be worked out. (AAMCO Exhibit 103).

On October 4, 1973, the National AAMCO Dealers Association convened in an emergency meeting in Chicago at which William McAlpine, Donald Layman, John Prior, Donald Stewart, Stuart Adams, John Folino, Luther Smith, and Aaron Reavis were all in attendance. The subject of the meeting was Gerald Shine's discussions with AAMCO management on October 2, 1973. The minutes of the October 4 meeting reflect (AAMCO Exhibit 103) that on—

October 2, 1973

Mr. Shine represents Association at meeting with AAMCO management and group of Chicago dealers. Management announces that availability book of new franchises is now obsolete; that insofar as the Chicago market is concerned—

(1) New marketing plan to be worked out on a yearly basis.

(2) Marketing plan will be presented to dealers in area for their opinions.

(3) Final marketing plan to be announced by AAMCO, made available to market.

(4) Until that final marketing plan for Chicago is announced, AAMCO will not accept any applications for sale of franchises in the Chicago SMSA.

(5) Sale of Franchise is defined as the taking of application and down payment from prospective Franchisee.

(6) Intend to implement this marketing program in the remainder of the country as soon as possible.

(7) Availability book now obsolete.

The record further reveals that on October 17 (AAMCO Exhibit 491), October 23 (AAMCO Exhibit 108), October 26 (AAMCO Exhibit 513), October 30 (AAMCO Exhibits 488, 489), November 6 (AAMCO Exhibit 492), November 19 (AAMCO Exhibit 489), November 20 (AAMCO Exhibit 489), and on November 23 (AAMCO Exhibit 490) AAMCO had been in written contact with one or another of the Executive Committee members from the Dealers Association. On each of these dates, AAMCO took steps towards the development of a detailed and explicit marketing program which would be different from that proposed in July of 1973.

On October 30, in particular, Keith Ladd, AAMCO's Executive Vice-President, wrote a letter to Gerald Shine which stated (AAMCO Exhibit 488):

We intend to implement our Market Development Plans which are similar in concept to the decision announced in Chicago, on a country-wide basis in the United States and Canada and will discuss this with the Executive Committee on November 20, 1973.

On November 20 at a Dealers' meeting in Philadelphia, AAMCO released its new franchise marketing program (AAMCO Exhibit 109; AAMCO Exhibit 490). Detroit was classified as one of the "closed" markets, which meant:

Markets where AAMCO has decided not to locate additional centers during 1974, 1975 and 1976. And the market will not be open for the placement or opening of new centers until 1977.

McAlpine was present at the November 20 meeting with AAMCO. After the meeting McAlpine called the Detroit dealers and

explained the entire AAMCO Marketing Program to them. The Detroit dealers, with full awareness of AAMCO's *revised* plans for the Detroit market, took an immediate vote and decided to definitely leave AAMCO (McAlpine—Tr at 126). On November 29, the Detroit AAMCO dealers officially terminated their relationships with AAMCO.

■ On the basis of this record, the court concludes that AAMCO's conduct did not justify the plaintiffs in terminating their Franchise Agreements. The most that can be said to support the position of the plaintiffs is that AAMCO's original marketing plan of July, 1973 was a threat to franchise success—but was never carried out. Pennsylvania law is well-settled that more than a threat of non-performance is needed before conduct can amount to an anticipatory breach of contract. The conduct must manifest an absolute and unequivocal refusal to perform. *Pennsylvania Law Encyclopedia,* Vol. 8, § 365, at 414; *McCloskey & Co. v. Minweld Steel Co.,* 220 F.2d 101 (3d Cir. 1955); *McClelland v. New Amsterdam Casualty Co.,* 322 Pa. 429, 185 A. 198 (1936). Thus, this court need not consider whether implementation of AAMCO's July, 1973 plan of expansion would have constituted a breach by AAMCO of its contractual obligation to help franchisees achieve success; the *mere threat,* subsequently withdrawn, of implementation which was manifested by AAMCO could not amount to a breach of contractual obligation.

The question remains as to why the plaintiffs felt justified in leaving AAMCO. Judge Aldisert's commentary in *Ungar v. Dunkin' Donuts of America,* 531 F.2d 1211 at 1223 (3rd Cir. 1976), on the maturation of franchisees is worth repeating:

> We would expect to find that an arrangement apparently reasonable at its inception begins to seem burdensome to the franchisee as the business is successfully established. Only from the successful business can the franchisor effectively seek a continuing return on investment; yet as the venture prospers, the fran-

chisee in time, may come to regard the arrangement as onerous, restricting his profitability. Viewed this way, it is apparent that the underlying issues are economic as much as legal.

McAlpine's deposition testimony of July 16, 1974, compels the same conclusion as reached by Judge Aldisert. When asked in 1974 why he terminated his AAMCO contract McAlpine stated:

A I felt we could do better. I, as an individual, felt I could do better not as an AAMCO Franchisee.

Q Is that the only reason? In other words, income, you could make more income on your own than you could as an AAMCO Franchisee?

A I looked for other things than income.

Q For instance?

A Status, success, name, product, many things.

Q Are you saying you felt you would acquire more status as an independent rather than with AAMCO?

A Yes.

Q Among your friends and social contacts?

A Yes.

■ Viewing the record objectively, it is clear that AAMCO's post-1969 conduct did not give the plaintiffs the right to repudiate the remainder of their 15-year Franchise Agreements.

Accordingly, this court concludes that the plaintiffs were in wrongful termination of their contracts when they left AAMCO on November 29, 1973.

### AAMCO's Breach-of-Contract Claims Against Adams and Magarian

In October 1965, Aram Magarian became the AAMCO franchisee at the Lincoln Park, Michigan, AAMCO shop. His Franchise Agreement (AAMCO Exhibit 13) stated:

(15) Licensee shall not sell, transfer, assign, sub-license, mortgage or pledge this agreement or any rights or privileges accruing hereunder to any person, firm, corporation or entity without the written consent of

the licensee which shall not be unreasonably withheld; Licensor need not give such consent in the absence of an agreement to execute, or the execution of, an agreement similar to these present between Licensor and purchasor.

In May, 1973, Magarian sold his Lincoln Park AAMCO center to Stuart Adams (Adams—Tr at 355).

On May 14, 1973, AAMCO's Contract Administrator wrote a letter to Mr. Adams informing Adams that the sale had not been approved by AAMCO and would not be approved by AAMCO until certain requirements were met (Joint Exhibit 15). The right of approval upon conditions being met is not unreasonable, especially for a franchisor like AAMCO whose reputation depends upon the maintenance of quality in its individual Dealers. Nonetheless, AAMCO accepted license fees, business reports, and franchise fees from Stuart Adams in recognition of Adams' use of the AAMCO trademark and Adams' desire to assume all of Magarian's financial responsibilities (Adams—Tr at 358).

In November, 1973, however, Stuart Adams, along with the other plaintiffs, terminated his relationship with AAMCO (Adams—Tr at 365). At the time of termination, Adams still had not been approved as an AAMCO franchisee. Adams' desire to be "a real franchisee" was the motivating factor behind his decision to leave AAMCO and join Interstate, where he did become "a real franchisee." (Adams—Tr at 359).

 Adams' termination of his AAMCO relationship was nothing more than the termination of his day-to-day license to use the AAMCO trademark. AAMCO at all times had the right to terminate its arrangement with Adams. The May 14, 1973, letter from AAMCO informing Adams of this situation stated that "you do not have the legal right to portray yourself as an AAMCO authorized franchisee." (Joint Exhibit 15). AAMCO's letter had the effect of putting Adams on notice that theirs was a de facto licensing arrangement which was revocable at will. Adams utilized this power of termina-

tion and was therefore within his lawful right vis-a-vis AAMCO when he terminated their relationship. The court thus cannot hold Adams liable to AAMCO for such conduct.

 Magarian, however, cannot escape liability. Magarian's sale to Adams was an attempted assignment of the AAMCO-Magarian Franchise Agreement, which AAMCO was unwilling to accept. The law is clear that legal duties cannot be extinguished by the mere act of an attempted assignment. *Restatement of Contracts*, § 160(4) states this as follows:

(4) Neither the delegation of performance by an obligor, nor a contract with the obligor by the person to whom the performance is delegated to assume the obligor's duty, extinguishes it or prevents recovery of damages from him if the duty is not performed.

Pennsylvania law is in accord. Under a Pennsylvania contract an assignor cannot escape the obligations of his contract merely by assigning the benefits thereof. *Parish Mfg. Corp. v. Martin-Perry Corp.*, 285 Pa. 131, 131 A. 710 (1926). The party with an original obligation to another cannot divest himself of liability to that party by contracting with a third party that the third party will assume such liability. *Husak v. Berkel, Inc.*, 234 Pa.Super. 452, 341 A.2d 174 (1975).

Were the law otherwise, then many a debtor by such an expression of intent to pass a duty through assignment could be rid of his debts. *Corbin, On Contracts*, § 866, Vol. 4 (1972) explains the lawful effect of such an expression of intent:

Any debtor can express such an intention, but it is not operative to produce such a hoped-for result. It does not cause society to relax its compulsion against him and direct it toward the assignee as his substitute. In spite of such an "assignment," the [obligor's] duty remains absolutely unchanged. The performance required by a duty can often be delegated; but by such a delegation the duty itself is not escaped.

Magarian's sale of his franchise to Adams may have accomplished an effective delegation of performance required under Magarian's Franchise Agreement. Adams' acceptance of this duty to perform was manifested by his payment to AAMCO of franchise fees. But when Adams turned the Lincoln Park AAMCO center into an Interstate franchise, the duty to continue operation as an AAMCO franchise remained. The duty at all times belonged to Magarian; Magarian is liable to AAMCO for the breach of this duty.

## C. DEFENDANT'S UNFAIR COMPETITION CLAIM:

Defendant AAMCO alleges unfair competition in that plaintiffs have taken AAMCO's merchandising program, forms and documents and have used them for their own profit as Interstate Transmission specialists. The contention running through the allegation seems to be that, because AAMCO has expended a large amount of money time and effort in developing its merchandising program, AAMCO has acquired a property right in the system, and equity should enjoin the defendants from appropriating it to their own use and profit.

Developments in two separate areas of the law are helpful in analyzing this contention. Under the federal patent laws that which is unpatented or unpatentable falls into the public domain and is unprotectable as a property right. Additionally, a long history of cases has determined that a "system" is not a "writing" that can be protected by copyright laws. These many cases holding that systems and plans are not copyrightable spring from the reasoning of *Baker v. Selden*, 101 U.S. 99, 25 L.Ed. 841 (1879) in which the Court first made a clear distinction between writings describing plans, methods, or systems, and the plans or systems themselves. The former were subject to copyright, the latter, if at all, to patent protection. See also, *Briggs v. New Hampshire Trotting & Breeding Ass'n, Inc.*, 191 F.Supp. 234 (D.C. N.H.1960). Under the state laws of trade secret protection, however, the holder of the secret has the right to exclusive use of the secret, regardless of its patentability. Insofar as the patent law favors disclosure of inventions, original systems, and unlimited competition in unpatented goods, the theory of trade secret law is in conflict since it expressly allows unpatented inventions and systems to go undisclosed.

An enormous amount of legal scholarship, generated by the precedent-setting case of *Sears Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) has been devoted to this conflict between state trade secret protection and the federal patent laws. In *Sears* and its companion case *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), the court held:

When an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article. To forbid copying would interfere with the federal policy, found in Article I, § 8, clause 8, of the Constitution and in the implementing federal statute, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain. Here Day-Brite's fixture has been held not to be entitled to a design or mechanical patent. Under the federal patent laws it is, therefore, in the public domain and can be copied in every detail by whoever pleases.

*Compco Corp. v. Day-Brite Lighting, Inc.*, supra, at 237–238, 84 S.Ct. at 782.

Following these decisions, the Sixth Circuit, in *Kewanee Oil Co. v. Bicron Corp.*, 478 F.2d 1074 (1973), held that the state trade secret laws were preempted by the federal patent laws. Citing *Sears* and *Compco*, the court, per Judge Kent, concluded at page 1087:

Our analysis of the relationship between the Patent Laws of the United States and the Trade Secret Laws of the State of Ohio . . . forces us to the conclusion that the field of protection afforded to this plaintiff by that Trade Secret Law has been preempted by the Patent Laws of the United States. We, therefore, hold that the Trade Secret Laws of the State

of Ohio may not afford to the plaintiff in this case protection which the plaintiff could not obtain under the Patent Laws.

Kewanee Oil Co. v. Bicron Corp., supra, was eventually appealed to the United States Supreme Court where the Court, at 416 U.S. 470, 94 S.Ct. 1879, 1891, 40 L.Ed.2d 315 (1973), put an end to the controversy it had originally generated in Sears, supra, by holding that a state's law of trade secrets is not preempted by the operation of the patent laws of the United States. The Court concluded:

It would be undesirable to impose the almost impossible burden on state courts to determine the patentability—in fact and in the mind of a reasonable inventor—of a discovery which has not been patented and remains entirely uncircumscribed by expert analysis in the administrative process. Neither complete nor partial pre-emption of state trade secret law is justified.

Thus, while the patent system seeks to counter-balance the motive and necessity for secrecy and thus increase the body of public knowledge and the level of competition, the rules against appropriation of trade secrets co-exist and are designed to protect the individual by insuring him the exclusive enjoyment of the fruits of his labor which he has chosen not to dedicate to the public. Any protection of the public via the trade secret doctrine is entirely incidental. See Comment, The Stiffel Doctrine and the Law of Trade Secrets, 62 Nw.U.L. Rev. 956, at 969 (1968). Accordingly, in this case, the fact that AAMCO's merchandising program might not be patentable does not affect AAMCO's right to seek relief as the holder of a trade secret.

The commonly accepted definition of a trade secret is found at Restatement of Torts, § 757, Comment b (1939). W. R. Grace & Co. v. Hargadine, 392 F.2d 9, at 14 (6th Cir. 1968). According to the Restatement,

[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to

obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

The subject of a trade secret must be secret, and must not be part of the public knowledge or of general knowledge in the trade or business involved. This necessary element of secrecy is not lost, however, if the holder of the trade secret reveals the trade secret to others in confidence, and under an implied obligation not to use or disclose it. These others may include those of the holder's employees to whom it is necessary to confide it, in order to apply it to the uses for which it was intended. Often the recipient of confidential knowledge of the subject of a trade secret is a licensee of its holder. See Lear, Inc. v. Adkins, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

Novelty, in the patent law sense, is not required for a trade secret. W. R. Grace & Co. v. Hargadine, supra, at 14. The Patent Act sets the standard for the patent system by providing that there must be novelty and invention as a condition to patentability, and that the public domain encompasses all which does not reach the requisite level of novelty and invention. The law of trade secrets, in providing that there need be no novelty to warrant trade secret protection, defines public domain solely in terms of secrecy.

Still, though, some novelty is required for a trade secret if only because that which does not possess novelty is usually known. Secrecy, in the context of trade secrets, implies at least minimal novelty. Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, at 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1973).

Thus, in the instant case a determination must be made as to whether AAMCO's merchandising system was an original, complex, unique system, or whether it was elementary, ordinary or common. The critical test is

whether AAMCO is entitled to protection for its own original, creative work, or whether it is to be given a property right for ideas which are common and ordinary. See *Briggs v. New Hampshire Trotting & Breeding Ass'n, Inc., supra.*

■ This court concludes that AAMCO's merchandising system (AAMCO Exhibits 156–175) does not constitute an "original, complex, unique system" which would entitle it to trade secret protection.

An analysis of AAMCO's Service Program (AAMCO Exhibit 156) reveals that the eight "customer procedures" are merely good business practices, but not unique procedures at all. AAMCO's Service Program consists in part of eight sets of instructions to be followed by AAMCO franchisees in handling customers. Although the Service Program provides the AAMCO employee with step-by-step instructions that encourage a prospect who calls AAMCO on the telephone to bring his car into the center, such a telephone "procedure" is used by many automotive service businesses. If a potential customer brings his car to AAMCO, AAMCO's Multi-Check procedure determines the source of the problem. But, such a checklist-diagnostic approach is not only well recognized in the field of automotive repairs, it is essential to the efficient operation of every repair shop and service agency. If a repair order has been authorized by an AAMCO customer and the service has been performed in accordance with the Service Program, AAMCO would contend that its merchandising program has been successfully sold to a customer.

But this is a misconception. AAMCO is in the business of providing a product at the end of the line; if AAMCO is in the business of selling anything to a customer, it is a quality rebuilt transmission, not a well organized sales pitch. As the singular function of a transmission repair specialist is to repair or replace defective transmission parts, all transmission repair centers must have a service program designed simply to get the customer into the shop and then to repair the damaged transmission as efficiently as possible. Specialized forms such as AAMCO's Multi-Check (AAMCO Exhibit 158) allow the transmission repairman through a quick series of ordinary diagnostic tests to locate and record the transmission problem. But, this is merely a formalization of procedures that would be followed by any service agency that hoped to effectively exist in a competitive market.

AAMCO has contended that it is in the business of selling a package to its franchisees that covers shop operations and customer handling as well as transmission services. Although it is uncontroverted that the AAMCO "procedures" help to make an AAMCO franchise more successful than it would be without them, such a fact simply reflects the increased efficiency resulting from the utilization of such organizational tools.

■ A look at those "procedures" for which AAMCO claims trade secret protection reveals why this court rejects AAMCO's contention that such procedures are either secret or unique. AAMCO wants protected:

1. Its price list for transmission services (AAMCO Exhibit 166);
2. Its daily business activity form (AAMCO Exhibit 160);
3. Its weekly business report form (AAMCO Exhibit 163);
4. Its service guarantee form (AAMCO Exhibit 168);
5. Its telephone procedure form (AAMCO Exhibit 174);
6. Its repair order form (AAMCO Exhibit 159);
7. Its multi-check diagnostic form (AAMCO Exhibit 158).

With the exception of its price list—a format utilized necessarily by all businesses which quote prices over the phone—and its telephone procedure, none of AAMCO's "secret procedures" are much more than an efficient form for recording information. The telephone procedure, effective though it may be, is also utilized in greater or lesser degree by all businesses that must attract customers through phone inducement. When AAMCO was in its infancy,

**1258**

AAMCO's Director of Franchise Training—Mr. Larry Kiick, developed the telephone track portion of the merchandising system as well as the diagnostic process of handling the customers in the shop. Mr. Kiick's deposition, which was admitted into evidence, is highly probative as to the lack of originality and uniqueness of AAMCO's telephone procedures.

Q Specifically [Mr. Kiick], how did you go about developing or creating or formulating, if you will, responses to customers on the telephone, the particular procedure that you employed at AAMCO?

A. Well, noting that there are definite patterns and people have different types of problems, there are different patterns of questions or responses that come up. I gathered these, put them in order and used, I guess, common sense basic sales psychology in structuring the responses. (Page 8)

Q What sources did you go to, to search for material to use in the AAMCO telephone track?

A I shopped other businesses, listened to the responses, and it seemed to make sense as far as satisfying needs that I felt we had, role playing sessions with people that were on the staff at AAMCO, at that time. (Page 9)

Q Now, do I understand correctly that you wrote a merchandising program for Cottman Transmissions which involved dealing with customers in shop and on the telephone?

A I was involved in putting that program together. Again, there were semblances that were there which I modified and updated. I cannot necessarily say, I created it from nothing.

Q To what extent, when you went to Cottman, did you use the same or similar telephone track material that you had used or developed at AAMCO?

A They are very similar (page 13) . . . The tracts are very similar, procedures are very similar, because the outcome has to be the same. (Page 15).

Q Did you develop a telephone tract for use by Milex franchisees in handling customers?

A Yes.

Q What business is Milex in?

A Tune-ups.

Q Can you describe for us any similarities between the Milex tract and the AAMCO telephone tract?

A Yes. Again, you greet the customers, find out the year, make of the car, what are the problems, what's it doing, and the questions they ask and responses are similar and you invite them in to check it out. (Page 22)

Q Did you ever, since leaving AAMCO, come to see that AAMCO multi-check form used in any other business or any portion of it?

A I've seen similar forms used elsewhere, a block layout like that. (Page 22).

Q Do you know if any other transmission company uses the word "initial customer contact procedure" or "customer contact procedure?"

A Yes, I used that at Cottman, very similar. (Page 35)

The net evaluation of AAMCO's contention relative to its forms and its entire merchandising program (AAMCO Exhibits 156–175) is essentially that neither AAMCO's forms or system contain any information that was ever unique to AAMCO. AAMCO has been an efficient organizer of what had previously been in the public domain for a very long time, long before the Interstate plaintiffs left AAMCO and went off on their own as Interstate Transmission specialists. There is no doubt that AAMCO did an excellent job of codifying the obvious. This is particularly true in an industry not known historically for its efficient operating procedures.

As for the copyrights that AAMCO has obtained on its Multicheck (AAMCO Exhibit 158), Car Ownership Guarantee (AAMCO Exhibit 168) and Banner Guaran-

tee (AAMCO Exhibit 170) forms, this court refers to the copyright regulations, 37 C.F.R. § 202, which provides that the following examples of works are not subject to copyright protection.

 (b) Ideas, plans, methods, systems or devices, as distinguished from the particular manner in which they are expressed or described in a writing;

 (c) Blank forms, such as time cards, graph paper, account books, report forms, order forms and the like, which are designed for recording information and do not in themselves convey information.

AAMCO's Multicheck is a form designed for recording information, and as such, is incapable of copyright protection. By copyrighting its Multicheck form improperly, AAMCO has put the form in the public domain and cannot recover on an unfair competition claim based upon misappropriation of the Multicheck form as a trade secret. *Continental Casualty v. Beardsley*, 253 F.2d 702 (2d Cir. 1957).

AAMCO has contended that unless this court protects a franchisor's work product with respect to its forms and procedures that the entire franchising industry would suffer from a terrible, and perhaps fatal, disability. In recognizing the seriousness of this problem, the court would add that a franchisor's claim must be evaluated upon a determination of the particular facts presented and not upon result oriented reasoning. AAMCO has not met its burden of proving that its system was either secret or novel. Novelty, as it affects secrecy, is not to be assumed merely because at some point in time other transmission specialists have not used a merchandising system identical to AAMCO's. Nor does a burden of disproving secrecy or novelty fall upon Interstate because it has admittedly borrowed from that which AAMCO has codified.

The principal cases that AAMCO has cited for the proposition that it deserves trade secret protection[1] all have complainants whose principal business advantages were pirated by its competitors. In the *International News Service* case, the competitors were in the business of gathering and distributing news for profit; the method of gathering news was pirated. In the *Pottstown* case, the competitors were disseminators of news to the public; the news stories were pirated. In the *Clark* case, the competitors were in the business of selling form contracts for prepaid funeral services; the form contracts were pirated.

AAMCO's principal business advantage, on the other hand, is that it repairs transmissions better and faster than its competitors. Its accessible local franchises and large scale parts program make this possible. Were this court to grant AAMCO the trade secret protection it desires for its merchandising forms and program, we would be extending the underlying rationale of the aforementioned cases to a factual situation in which the "pirated" material has a far less critical effect on the business advantages of the complainant. Were this court to grant AAMCO the property right protection it seeks of its entire merchandising program, it would be granting AAMCO the exclusive right to the use of the same transmission service and solicitation procedures that other transmission repair specialists would recognize in the normal course of business without regard to AAMCO.

Accordingly, for the reasons enumerated, AAMCO's claim for misappropriation of trade secrets as a form of unfair competition must be denied.

### D. DEFENDANT'S TRADEMARK INFRINGEMENT CLAIM:

The court denied AAMCO's claim for trademark infringement in its Bench Opinion of November 3, 1977, for reasons therein enumerated. That Bench Opinion is incorporated herein by reference.

### E. DEFENDANT'S RESTRAINT OF TRADE CLAIMS:

AAMCO alleges that during the various meetings which took place among the plain-

---

1. *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918); *Pottstown Daily News Publishing Co. v. Pottstown Broadcasting Co.*, 247 F.Supp. 578 (E.D.Pa.1965); *Clark v. Bunker*, 453 F.2d 1006 (9th Cir. 1972).

tiffs between September, 1973 and November 29, 1973, the plaintiffs planned two alternative causes of action, either of which would constitute restraint of trade in violation of the Sherman Act, 15 U.S.C. § 1:

(1) the plaintiffs would prevent the sale by AAMCO of any additional new franchises in the Detroit area, or

(2) the plaintiffs would break their AAMCO Franchise Agreements and form a competing organization.

AAMCO alleges as a matter of law that the first alternative would have the effect of limiting intra-brand competition among AAMCO dealers in the Detroit area, restrain AAMCO in its business of selling franchises and licensing others to use its name and mark in the Detroit area, and effectively allocate the Detroit market as it then existed among the conspiring AAMCO franchisees. The latter alternative would have the effect of eliminating AAMCO as a competitive force in the Detroit area, since it was contemplated that the only way such a move would be successful was if each individual AAMCO dealer would join in the venture. Since the plaintiffs did break away from AAMCO to form a competing organization, the court will discuss this latter allegation first.

The relevant chronology of events for AAMCO's restraint of trade claims is as follows:

During the year 1973, AAMCO dealers in Detroit (plaintiffs) conducted regular monthly meetings to discuss advertising and other business. These meetings were usually held on a Wednesday, and were ordinarily held in the offices of Goldfarb & Korelitz, the advertising agency for the pool of Detroit dealers, or in various AAMCO centers in Detroit (Stipulation of Facts, ¶ 21).

During the months prior to August of 1973, the dealers had reviewed and committed future advertising, which included Yellow Page subscriptions to run through 1974. Plaintiffs McAlpine and Folino had also committed themselves to advertising both in the Yellow Pages and in the local media for their new AAMCO center in Farming-ton, Michigan (AAMCO Exhibits 121, 123, and 351).

During 1973, from late September through early October, there were no meetings held of Detroit dealers at which the subject of breaking Franchise Agreements with AAMCO was discussed (Schlachter Dep. at 6).

At this time, though, AAMCO was planning to add AAMCO centers to various markets in 1974, including the Detroit market. AAMCO first publicly announced these plans by the delivery to the National AAMCO Dealers Association (NADA) of AAMCO's "Availability Book" (AAMCO Exhibit 101) on June 27, 1973 (Stipulation of Facts, ¶ 16). Under its Franchise Agreements with plaintiffs, AAMCO had the right to add new franchises in the Detroit market. (See Paragraph 1 of various Franchise Agreements, AAMCO Exhibits 1–17). Further, plaintiffs "readily acknowledged" that the Detroit market could absorb "additional dealerships" (Pretrial Order, at 25).

The availability book, which proposed the possible addition of nine new centers to the Detroit market, was transmitted to William McAlpine by NADA staff member, Eleanor Fasbinder, on or before July 30, 1973 (AAMCO Exhibit 102; Stipulation of Facts, ¶ 17). McAlpine was president of NADA at the time (Stipulation of Facts, ¶ 32).

Between July 30 and September 18, 1973, AAMCO and NADA held discussions and corresponded concerning various elements of AAMCO's procedures for the sale of franchises. This included submission by AAMCO of revisions of certain of its procedures for the sale of franchises on September 5, 1973 (AAMCO Exhibit 103; Stipulation of Facts, ¶ 18).

On September 18, 1973, NADA held a meeting in Chicago, Illinois. Many of the plaintiffs attended. A principal topic of discussion at this meeting was AAMCO's proposal for the addition of new franchises to various markets, including Detroit (Stipulation of Facts, ¶ 19).

Subsequently, within a week or two, all plaintiffs attended a meeting at the offices

of their advertising agency, Goldfarb & Korelitz, to discuss their reaction to AAMCO's proposal to add new centers in Detroit. In addition to the plaintiffs, AAMCO dealers Vincent Schlachter and Robert Martin were also present. At this meeting, the plaintiffs agreed that they were opposed to the addition of any new centers to the Detroit market, at least until a spacing accommodation could be arranged, so that the existing AAMCO dealerships would not be faced with new centers located so close to existing dealers that they could not survive while large geographic expanses within the Detroit market were allowed to lie fallow with no dealerships whatsoever. The plaintiffs knew that they had several alternative courses of action open to them: they could negotiate with AAMCO through the offices of NADA in an effort to have the proposal modified or abandoned (Schlachter Dep. at 15), or if they were unable to secure from AAMCO a modification of the proposal, they could as a last resort terminate their Franchise Agreements with AAMCO and leave the chain (Schlachter Dep. at 17, 43).

The plaintiffs agreed that from the first meeting no discussion should be had with outsiders concerning these topics (Schlachter Dep. at 90) since William McAlpine, as the current president of the National Dealers Association, would be the only authorized spokesman for the Detroit AAMCO dealers (Schlachter Dep. at 92–93). It was agreed that if other plaintiffs spoke to outsiders regarding the topics discussed it would only increase the possibility of misunderstandings (Schlachter Dep. at 92).

Between late September and early December of 1973, a number of similar meetings of Detroit dealers were held usually on a weekly basis, and sometimes more frequently (Schlachter Dep. at 29; AAMCO Exhibit 128). Most or all of the plaintiffs in this action were present at meetings between September 18 and November 29, 1973 (Stipulation of Facts ¶ 22; Schlachter Dep. at 28, 39).

In the past, NADA had been instrumental in resolving differences between AAMCO and the dealers through the use of its good offices and the participation of its directors and officers. However, between September 18 and November 29, 1973, no plaintiff ever brought to the attention of NADA, or any of its officers, the possibility that any dealer in Detroit would terminate his contract with AAMCO—for any reason. During the same time, AAMCO officials met with representatives of NADA and with dealers in the Chicago market to discuss their concerns about new AAMCO locations. But no plaintiff ever requested such a meeting be held with the AAMCO dealers in Detroit.

On October 2, 1973, AAMCO announced that it would withdraw the proposal to add new locations that it had made in June of 1973, and that it would design a new approach to the expansion of the chain and its major markets. It was agreed between AAMCO and NADA that NADA would have the opportunity to comment upon the details and implementation of the new marketing system. Tentative deadlines were scheduled for further meetings on the subject (Stipulation of Facts, ¶ 28).

On numerous occasions between October 2 and November 20, 1973, representatives of AAMCO and NADA met and discussed the development of a new marketing approach. Within NADA, members of its executive committee, including president McAlpine, also discussed AAMCO's commitment.

On October 4, 1973, the NADA executive committee members met in Chicago. At this meeting, a report was made on the October 2 announcements of AAMCO regarding withdrawal of the proposal to add new franchises, including a report on the progress of negotiations with AAMCO concerning the features of its new marketing program (Stipulation of Facts, ¶ 28).

On Wednesday, October 10 or Wednesday, October 17, 1973, a meeting of the Detroit dealers was held in Detroit and McAlpine made a report on the October 4th meeting of NADA as well as the scheduled meetings with AAMCO on the topic of market development. McAlpine told the Detroit dealers that AAMCO was moving ahead with its proposal for the Detroit market (Stipulation of Facts ¶ 32).

At this time, McAlpine reported that he held out hope of a settlement with AAMCO, and that breaking the Franchise Agreements would be unnecessary. At this and other meetings, each dealer was polled as to his position and queried as to his questions or reservations.

On October 24, 25 and 26, 1973, Folino, McAlpine, and others conferred with an attorney by telephone and in person concerning the drafting and execution of pre-incorporation papers and agreements for a new transmission repair corporation (Stipulation of Facts, ¶ 27).

On October 28, 1973, the plaintiffs cancelled all local media advertising effective October 29th (Stipulation of Facts, ¶ 38). On October 30, 1973, the pre-incorporation agreement of Interstate (AAMCO Exhibit 329) was signed by all the plaintiffs, and on November 1, 1973, the AAMCO Yellow Pages subscription contract for the 1974 Detroit suburban directory was also cancelled (AAMCO Exhibit 126).

AAMCO contends that such cancellation and pre-incorporation agreement establish that at this point the plaintiffs had irrevocably committed themselves to breaking away from AAMCO. The record sheds additional light on this proposition. Donald Stewart testified that the plaintiffs had to get in a cancellation notice by November 1 in order that they not wind up paying for an AAMCO ad in the 1974 Detroit Yellow Pages (Tr at 553). Furthermore, if the plaintiffs had been able to iron out their disagreements with AAMCO, they could have been inserted into the new Yellow Pages at any time from November 1 to December 15 (Tr at 561). Although they would have lost their right to inspect the proofs (AAMCO Exhibit 126), McAlpine testified that the decision to leave AAMCO was made after the pivotal marketing program meeting with AAMCO on November 20, 1973:

As soon as I left the [November 20] meeting, I called the Detroit dealers; I talked to John Folino; I explained the entire program to them, to him on the telephone. He then explained it to the dealers, the Detroit dealers, and they at that time took a vote and decided to leave and I said I would go, I would go with their decision. That's when the actual decision was made to leave AAMCO. (Tr at 126).

The plaintiffs at all times prior to November 20, 1973, seemed to regard their early signing of a pre-incorporation agreement, their preparations to leave AAMCO, and their Yellow Pages cancellation as the consideration of an "alternative situation" (Tr at 126) and an assurance that they would not end up paying advertising expenses as a group of AAMCO dealers if their AAMCO problems proved to be unresolvable (Tr at 554).

Within a day or two after November 20, 1973, however, all of the plaintiffs had met and agreed to terminate their Franchise Agreements with AAMCO.

(a) Conspiracy to Eliminate AAMCO as a Competitor

There is evidence that while the plaintiffs were debating to leave AAMCO they discussed that the concerted terminations of their contracts would have the effect of eliminating AAMCO as a competitor in the Detroit market for four or five years.

AAMCO contends that the plaintiffs in a calculated fashion deliberately practiced deception upon the Yellow Pages subscription agency, and upon AAMCO, by concealing the cancellation of ads (AAMCO Exhibit 126). The purpose of concealing the cancellation of Yellow Pages ads from AAMCO was, according to AAMCO, to deny AAMCO the opportunity to make new or different insertions in the forthcoming Yellow Page listings (Schlachter Dep. at 58). To that same end, claims AAMCO, McAlpine and the other plaintiffs deliberately refused to advise AAMCO officials of their concerns, and McAlpine specifically deceived AAMCO executives concerning his reaction to the marketing program announced on November 20, 1973.

AAMCO also contends that the plaintiffs planned among themselves and intended that the effect of terminating their Franchise Agreements in concert was to leave

AAMCO without a single competing outlet in the Detroit metropolitan area. AAMCO alleges that the plaintiffs agreed that all of them must join in order to make their venture successful. As part of this objective, plaintiffs conducted meetings which were secret so that individual dealers would not be subjected to pressure or persuasion from AAMCO or anyone else.

Subsequent to leaving AAMCO, on December 4, 1973, plaintiff Folino registered the name "AAMCO Transmissions" in Lansing, Michigan (AAMCO Exhibit 332). This would have the proposed effect of precluding AAMCO from registering to do business under its own name in Michigan. On December 6, 1973, plaintiff Luther J. Smith III registered the name "AAMCO Properties" in Lansing, Michigan (AAMCO Exhibit 333). This would have the proposed effect of precluding AAMCO's real estate subsidiary from registering to do business under its name in Michigan.

AAMCO alleges that the plaintiffs conceived this litigation, and filed a multicount Complaint, with the specific intention of using it as a strategy to divert AAMCO's energy and resources away from competition in the market place (Schlachter Dep. at 61). AAMCO further alleges that the plaintiffs sought the silence of AAMCO's operations manager in the Detroit market so as to delay AAMCO's efforts to deal with or recover from the loss of all of its Detroit centers (AAMCO Exhibit 312; Schlachter Dep. at 83), and that prior to leaving AAMCO, the plaintiffs withheld advertising fees from AAMCO to impede AAMCO's market development in Detroit (Schlachter Dep. at 97–98).

Finally, AAMCO contends that the plaintiffs, in breach of the Sherman Act and as a retaliatory and punitive measure against Robert Martin, the only dealer from AAMCO who attended the meetings but did not join Interstate, listed a dummy telephone number in Pontiac, Michigan. This center, listed in the Yellow Pages as an Interstate center, is nonexistent; telephone calls are referred to other Interstate centers (Tr at 569–570).

Even though the evidence suggests that the plaintiffs hoped their actions would be a deterrent to AAMCO's re-establishing their position in the Detroit market (Schlachter Dep. at 114–115), AAMCO's restraint of trade theory must fail because of a failure to prove the requisite actionable injury.

■ This is a private antitrust action. Standing to sue under the antitrust laws is bestowed upon a private party by Section 4 of the Clayton Act, 15 U.S.C. § 15, as follows:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Thus, in order to establish a private right of recovery under the Sherman Act, a plaintiff must prove:

(1) A violation of the Act by the defendant;

(2) A direct injury to plaintiff's commercial business or property caused by the defendant's illegal conduct; and

(3) The monetary extent of such injury.

See *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894 (5th Cir. 1973); *Gray v. Shell Oil Co.*, 469 F.2d 742 (9th Cir. (1972); *Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir. 1971); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 297 F.2d 906 (2nd Cir. 1962); see also, Von Kalinowski, *Antitrust Laws and Trade Regulations*, Vol. 15 (1977) § 1125.02[1].

Section 4 of the Clayton Act expressly restricts the right to sue for treble damages to suits based on injuries which occur "by reason" of antitrust violations. AAMCO, therefore, can succeed in its antitrust claims only if it is able to show that its injury was caused by conduct prohibited by the antitrust laws. See, *Zenith Vinyl Fabrics Corp. v. Ford Motor Co.*, 357 F.Supp. 133 (D.C.);

*Winckler & Smith Citrus Products Co. v. Sunkist Growers, Inc.,* 346 F.2d 1012 (9th Cir. 1965).

Since the statute (15 U.S.C. § 15) which gives the private litigant the right to sue imposes the basic requirement that there be injury to the plaintiff's business, it has been held repeatedly that the gist of the action is illegal injury, not mere violation of the antitrust laws. The damage for which recovery may be held in a civil action must be proximately related to the conspiracy; recovery for a statutory violation is not based on the conspiracy itself but on injury to the plaintiff produced by specific overt acts pursuant to the conspiracy. The mere existence of an antitrust violation is not sufficient in itself to support a private antitrust action, nor does a violation per se give a private cause of action. Timberlake, "Legal Injury Requirements and Proof of Damages in Treble Damage Actions under the Antitrust Laws," 30 Geo. Wash.L.Rev. 231, 232 (1961); *Winckler & Smith Citrus Products Co., supra; Shumate & Co., Inc. v. National Association of Securities Dealers, Inc.,* 509 F.2d 147 (5th Cir. 1975).

In an attempt to avoid the necessity of proving the fact of damage, AAMCO argues that this is a "per se" case, akin to the anti-competitive conduct which the Supreme Court determined to be per se unlawful in *United States v. Topco Associates,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). There is no merit to this argument. The concept of per se violations was developed in response to cases holding that for purposes of Section 1 of the Sherman Act, 15 U.S.C. § 1, certain restraints were of such a pernicious nature as to be held unreasonable without the necessity of inquiring into their actual effect upon competition. Thus, although the Supreme Court has indicated that in per se cases under the Sherman Act, no allegation or proof of pub-

lic injury is necessary, *Radiant Burners, Inc., v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's, Inc. v. Broadway-Hale Stores,* 359 U.S. 207, 211, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), the fact that an alleged antitrust violation is of a per se nature in no way satisfies AAMCO's need to establish injury to its business or property as required by Section 4 of the Clayton Act. *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.,* 463 F.2d 1002 (5th Cir. 1972); *McMacken v. Schwinn Bicycle Co.,* 1974–1 Trade Cases. ¶ 96,688 at ¶ 96,690, n. 4 (N.D.Ill.1973).

AAMCO was undeniably injured when its Detroit franchisees left the AAMCO fold. As a result of the group exodus of all its Detroit franchisees in November 1973, AAMCO was left with only three transmission repair shops in the Detroit metropolitan area. In 1973, AAMCO had received $171,569 in franchise royalties from the ten AAMCO franchises that subsequently left AAMCO (AAMCO Exhibit 282 at 17).[2] In 1974, without the existence of these ten Detroit franchises, AAMCO received only $18,000 in franchise royalties. AAMCO has provided detailed records of four years of expenditures made in order to re-establish itself in the Detroit market at a level equal to the rate of franchise royalties generated by the ten Detroit franchises that left AAMCO. Mr. J. Wynn Chapman testified for AAMCO that as soon as AAMCO realized that its Detroit dealers were irrevocably committed to breaking away, AAMCO dispatched Chapman and a team of trouble-shooters to Detroit to establish a new advertising agency and an AAMCO planning program to redevelop the Detroit market. AAMCO continued its general Detroit advertising program during this time in order to convince the public that it was still in the metropolitan market. As a re-

2. This figure is computed in the following manner. In 1973, the average monthly transmission (parts and labor) sales of each of the ten Detroit centers that eventually left AAMCO was $22,442. The average royalty fee paid by each of these ten Detroit franchises was 6.95 percent of their monthly sales gross. On that basis the total franchise royalties paid AAMCO by these ten franchisees through November 1973 was $171,569.

sult, AAMCO bought advertisements in the local papers, on radio, and on television with greater frequency than normal during this critical period. Purdy Company, Inc. was then established by AAMCO in Detroit to bring new franchises to the Detroit area. AAMCO sent real estate salesmen to Detroit to procure sites for these soon-to-be-opened Purdy/AAMCO shops. On April 22, 1974, 120 days after the plaintiffs had left AAMCO, the first of the three Purdy Co., Inc./AAMCO shops opened in Detroit. (See Defendant's Answer to Interrogatories, # 48, Second Set). By November, 1977, eleven Detroit AAMCO shops were again flourishing in the Detroit metropolitan area. The loss in franchise royalties to AAMCO for the previous four years exceeded $250,000.[3]

■ AAMCO, however, has not met its burden of proving that such damage flowed from anything other than breach of contract. AAMCO's loss was created by the resulting void in what was formerly their dominant position in the Detroit transmission market. But, unless this void was caused by an antitrust violation, AAMCO, if entitled to damages, would be entitled to ordinary contract damages, not treble damages. The rule is well established that an antitrust plaintiff must show that an antitrust violation was a *material* cause of his damages in order to have those damages trebled. *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, at 114, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). The proof of damage alone cannot constitute liability under the Sherman Act. *Ace Beer Distributors v. Kohn, Inc.,* 318 F.2d 283 (6th Cir. 1963).

AAMCO's reliance upon *C. Albert Sauter, Inc. v. Richard S. Sauter Co.,* 368 F.Supp. 501 (E.D.Pa.1973), and *Bowen v. New York News, Inc.,* 522 F.2d 1242 (2d Cir. 1975) is thus misplaced. Although the *Sauter* case is sound law for the proposition that a conspiracy to injure a competitor in interstate commerce is a violation of Section 1 of the Sherman Act, in *Sauter* the conspirators solicited over 90 percent of the executive and skilled employees from the plaintiff, and obtained over 80 percent of those employees solicited. There was evidence in *Sauter* that as a result of the loss of key personnel, plaintiff suffered an immediate and drastic reduction in sales, attributable to plaintiff's own inability to service its remaining customers due to the loss of personnel to defendants. There was sufficient evidence in *Sauter* that the defendant solicited, hired or frightened away plaintiff's key employees for the purpose of eliminating plaintiff as a competitor.

In the *Bowen* case, a group of independent home delivery dealers of newspapers sued a newspaper publisher and its franchised dealers under the antitrust laws. The independent dealers claimed injury by defendant's conduct which consisted of a successful and concerted effort to prevent the independents from competing in territories served by franchise dealers. The case, however, was remanded to the district court to receive *proof* of any damages suffered by plaintiffs as a result of the actions of the defendant.

AAMCO's situation differs significantly from *Sauter* and *Bowen.* Whereas in *Sauter* the injury suffered was solely attributable to conduct which was found to violate the antitrust laws, AAMCO's injury is wholly attributable to the termination of Franchise Agreements. AAMCO's recitation of specific incidents of anti-competitive conduct—the registration of AAMCO's name in Michigan, the last minute cancellation of AAMCO's Yellow Pages advertising, the solicitation of AAMCO employees, the secretive conduct, and the retaliatory conduct against Robert Martin—has not been supported by proof of damage flowing from such conduct. The proofs fail to show that any employee was hired away from AAMCO or that AAMCO had any problem in re-registering its name in Michigan. Furthermore, AAMCO knew of the Yellow Pages cancellation by November 29, 1973

---

3. See the "Damages" section of this Opinion for a discussion of the computations used in determining this amount.

(AAMCO Trial Brief at 21). Since AAMCO could have inserted another AAMCO advertisement into the Yellow Pages up until December 15, 1973 (Tr at 561), this court cannot uphold AAMCO's contention that the Yellow Pages cancellation in any way delayed their re-entry into the Detroit transmission market. If AAMCO's re-entry into the market was stalled by any retaliatory conduct against Robert Martin, AAMCO has similarly provided the court with no proof of injury either to AAMCO or Mr. Martin.

AAMCO contends that the unilateral and sudden termination of contracts had the effect of impeding the flow of interstate commerce and that this will also support a claim under Section 1 of the Sherman Act. AAMCO cites *DeVoto v. Pacific Fidelity Life Insurance Co.*, 516 F.2d 1 (9th Cir. 1975), for this proposition, but such reliance is again misplaced. In *DeVoto*, a contract with plaintiff was indeed breached. But, the antitrust laws were violated not because the contract breach itself restrained trade, but because the plaintiff's contract offer was superior to the contract offer ultimately offered and accepted by defendant and because the defendant conspired to get plaintiff's contract abrogated. The decision to abrogate plaintiff's contract was made in consideration of the TransAmerica Corporation's conglomerate business relationship with both the contractor and the defendant, and in response to pressure to keep the business of mortgage protection insurance within the TransAmerica "family." This anti-competitive arrangement, not the contract breach, restrained trade and thus violated the antitrust laws.

Similarly, for AAMCO, the plaintiffs' breach of contract cannot in itself state an antitrust violation merely because the termination had the effect of hurting AAMCO's competitive position in the Detroit market. The antitrust laws are not intended to protect an existing business such as AAMCO against loss in a competitive market. *United States v. Branch River Wool Combing Co.*, 320 F.Supp. 1324 (D.C. R.I.1971).

AAMCO has not proven that the Interstate plaintiffs had monopoly power, that they would likely acquire it as a result of their contract termination, or that they ever had the intent to monopolize. Thus, AAMCO cannot succeed in its additional claim that the alleged contract breach violated the antitrust laws as being evidence of a conspiracy to monopolize or an actual monopoly in effectively allocating the 1973 Detroit transmission market among the plaintiffs. *American Tobacco Co. v. United States*, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1945); *Granader v. Public Bank*, 281 F.Supp. 120 (D.C.Mich. 1967); *United States v. Consolidated Laundries Corp.*, 291 F.2d 563 (2d Cir. 1961). AAMCO has submitted evidence revealing that the plaintiffs hoped to delay AAMCO's re-entry into the Detroit market (Schlachter Dep. at 115). But, such evidence cannot support a claim of conspiracy to monopolize absent proof of the specific intent to monopolize. *American Tobacco Co. v. United States, supra*. Such proof was never submitted nor could it be inferred.

Finally, in holding that the conduct during and after the plaintiffs terminated their Franchise Agreements did not injure AAMCO in violation of the antitrust laws, the court cites *South Carolina Council of Milk Producers v. Newton*, 360 F.2d 414 (4th Cir. 1966) at 419:

> The pivot of decision presently is whether the defendants' asserted conduct was the proximate cause of the plaintiffs' asserted injury. If the damage was merely incidental or consequential, or if the defendants' antitrust acts are so removed from the injury as to be only remotely causative, the plaintiffs have not been injured "by reason of anything forbidden in the antitrust laws" as contemplated by the Clayton Act. (Citations omitted). This is a critical determination which must be made by the court on the evidence offered by the plaintiff.

**(b) Conspiracy to Prevent AAMCO from Expanding in the Detroit Market**

AAMCO also contends that certain conduct of the plaintiffs *prior* to the franchise

termination violated the antitrust laws. This contention and the applicable facts are as follows: AAMCO contends that a conspiracy among the plaintiffs, which commenced at their first meeting after their return from the Chicago meeting of the National AAMCO Dealers' Association in September, 1973, threatened to break each and every contract of a dealer in the Detroit area unless the plaintiffs had an assurance that they could have greater input into the award of any new franchises in the Detroit market. This "veto" power would effectively insure that they could maintain their present market power without any dilution by the addition of even a single new AAMCO center. This would also hold the number of shops in Detroit at thirteen (13), where it had been since 1968, and allow each plaintiff's center to effectively maintain allocation of territories without new competition.

Thus, the alleged object of the conspiracy was to curtail proposed AAMCO expansion in the Detroit market to the benefit of the plaintiffs.

 Franchise veto power constitutes a horizontal conspiracy which is per se unreasonable in violation of the antitrust laws. *American Motor Inns v. Holiday Inns, Inc.*, 521 F.2d 1230 (3rd Cir. 1975); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). But both the *Holiday Inns* and *Topco* cases are so factually dissimilar from the instant case that the rationales of *Holiday Inns* and *Topco* are inapplicable here. In *Holiday Inns*, plaintiff, an existing franchisee of Holiday Inns, Inc., applying for a Newark franchise, alleged a violation of Section 1 of the Sherman Act on the theory that Holiday Inns, Inc. conspired with other Newark franchisees to restrain and monopolize trade in the Newark, New Jersey area hotel-motel industry. Holiday Inns, Inc.'s standard practice, upon receipt of an application to construct a new Holiday Inn, was to send out "radius letters"—i. e., written notices of the application to at least the three Holiday Inns nearest the proposed site—affording them fifteen days to com-

ment upon the proposed additional inn. Although Holiday Inns' executive committee made the final determination where there was an objection to an application the court agreed with the trial judge that the radius letter gave to existing franchisees a "veto of sorts" over applications for franchises and constituted an illegal conspiracy, at least with respect to plaintiff's application for a Holiday Inn at the Newark airport.

In *Topco*, the Supreme Court declared: One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition . . . This Court has reiterated time and time again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.'

In *Holiday Inns* and *Topco*, the plaintiffs were both unsuccessful applicants for the right to profit from the respective franchised products being offered for sale. Franchise veto power over plaintiffs' applications effectively insulated existing Holiday Inn and Topco members from intrabrand competition, thereby constituting per se antitrust violations and unreasonable restraints of trade in both cases.

 AAMCO's claim, however, cannot fall within these perimeters. There is no franchise applicant to this case who, by virtue of franchise veto power, was denied a chance to compete among the existing AAMCO Detroit franchisees. AAMCO's contention is that *it* was denied the opportunity to add AAMCO franchises to the Detroit market by virtue of the threat that the Detroit dealers would withhold their franchise fees from AAMCO and then break away from AAMCO unless AAMCO gave the assurance that the Detroit dealers could have additional input into the award of any new franchises in the Detroit market. The facts, however, do not support AAMCO's contention.

AAMCO's initial allegation that the plaintiffs engaged in a horizontal conspiracy to prevent the sale by AAMCO of any

additional new franchises in the Detroit market is not supported by adequate proof. Each of the plaintiffs has testified that there was room in the Detroit market to support additional dealerships (McAlpine—Tr at 55; Stolaruk—Tr at 211; Smith—Tr at 244; Prior—Tr at 303; Reavis—Tr at 366; Layman—Tr at 445; Stewart—Tr at 503; Folino—Tr at 625).

The problem was not additional AAMCO franchises in the Detroit area, but proper spacing within the market so that the AAMCO dealerships would not end up so close to one another that they could not survive, while other territory remained unexploited. The testimony of William McAlpine and Aaron Reavis on this matter is especially enlightening:

Q Why did you feel that the addition of dealers to the Detroit market was such a threat to you as to amount to a breach of contract by AAMCO?

A [McAlpine] Well, I didn't say addition of dealers, I said addition of dealers without any proper spacing or any geographical area where you could make a living. You should have space to make a living, that's what I'm talking about . . . We said 15 or 20 shops could be in the Detroit market if they were properly spaced and they weren't added so fast that they would destroy the market . . We worked out [an expansion], sent it to Harold Stanley and about two months later they opened the Cox and Reavis shop right between my shop and John Folino's shop in Garden City. When the Yellow Pages came out in September my business went down 25% and then fighting with Cox and Reavis, I don't think they ever made any money at that shop. (Tr at 56).

Q What bothered you about more dealers coming into Detroit?

A [Reavis] It wasn't so much, but it was where they were going to put them, and I probably knew better than anybody in Detroit what happens when you bunch up dealers. My shop was located less than five miles between Folino's and McAlpine's shops and my shop lost money every year except one when I just barely got in the black that year and I'm sure most of the business I did came out of their hide, so that put me in the position where it was awfully rough for me to operate my business. (Tr at 386).

This is a situation where the plaintiffs who made up AAMCO's Detroit chain of distribution were seeking to get AAMCO to compete more effectively through a spacing program that would *add* entries into the Detroit marketplace. Unlike the *Topco* or *Holiday Inns* cases, there has been no proof of an intention or attempt to restrict intrabrand competition by prohibiting entries into the Detroit market.

AAMCO has supplied no proofs to indicate that its nationwide marketing program which placed a temporary moratorium on the additional franchises in certain areas was instituted upon the coercive power of a Detroit AAMCO dealer's conspiracy. The proofs reveal that AAMCO, on November 20, 1973, announced a nationwide marketing program whereby it would place an immediate moratorium on expansion (Tr at 108–118). Such a nationwide program was instituted in part because the Chicago AAMCO franchises had begun to withhold franchise fees in response to AAMCO's past failure to implement an organized marketing plan (Tr at 116), in part because AAMCO wanted to appease other AAMCO dealers who faced increasing intra-brand competition, particularly in Detroit (Tr at 119), and in part because AAMCO was overdue in offering a national marketing plan to its National AAMCO Dealer's Association (Tr at 117–118).

The Detroit AAMCO franchisees, unlike the defendants in either *Holiday Inns* or *Topco*, did not have the intent or power to exclude direct intra-brand competitors from the market. AAMCO's decision to impose a moratorium on expansion in Detroit and elsewhere was a business decision. No proof exists that concerted Detroit franchisee activity forced AAMCO into making

this business decision. Absent such proof, this court cannot conclude that the plaintiffs were involved in a horizontal conspiracy to exclude intra-brand competitors from the market.

■ Accordingly, the court holds that the plaintiffs did not breach the antitrust laws in their conduct toward AAMCO prior to franchise termination, and that even though subsequent conduct was evidentiary of a possible breach of the antitrust laws, AAMCO was not injured in an actionable manner by such possible violations.

## F. DEFENDANT'S INTERFERENCE WITH CONTRACT CLAIM:

Section 766 of the Restatement of Torts states the general principle of liability in the absence of privilege for inducing a breach of contract. According to the Restatement:

> . . . one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
> (a) perform a contract with another, or
> (b) enter into or continue a business relation with another
> is liable to the other for the harm caused thereby.

In this regard, defendant AAMCO contends that had it not been for the conduct of certain of the plaintiffs, particularly William McAlpine and John Folino and their encouragement, especially in light of their position as men of influence and leadership among the individual AAMCO dealers in the Detroit area, the other individual Detroit AAMCO dealers would not have breached their Franchise Agreements with AAMCO. AAMCO further contends that every plaintiff interfered with AAMCO's rights under each of the other plaintiffs' franchise contracts with AAMCO.

■ In order to be held liable for interference with a contract, the plaintiffs must be shown to have caused the interference. Prosser, *Handbook of the Law of Torts*, Fourth Edition, 1971, at 394. It is not enough that they merely have reaped the advantages of the broken contract after the

contracting party has withdrawn from it of his own motion. *B. J. Wolf & Sons v. New Orleans Tailer-Made Pants Co.*, 113 La. 388, 37 So. 2 (1904); *Northern Wisconsin Corp. Tobacco Pool v. Bekkedal*, 182 Wis. 571, 197 N.W. 936 (1923); *Minnesota Wheat Growers' Coop. Marketing Ass'n v. Radke*, 163 Minn. 403, 204 N.W. 314 (1925); *Fischnaller v. Sumner*, 53 Wash.2d 332, 333 P.2d 636 (1959). Thus, acceptance of an offered bargain is not itself inducement of the breach of a prior contract, and it is not enough that the plaintiffs have done no more than enter into new contracts with knowledge of their initial contracts. *Horth v. North American Aggregates Corp.*, Ohio App., 35 N.E.2d 592 (1940); *Lamport v. 4175 Broadway, Inc.*, 6 Supp. 923 (S.D.N.Y.1934); *Wolf v. Perry*, 65 N.M. 457, 339 P.2d 679 (1959).

■ Although the tort of "interference with contractual relations" does not necessarily require *inducement* to action as sine qua non, those situations where an action may be maintained in the absence of inducement—e. g., a defendant preventing the performance of a contract, or making the performance more onerous, or misdirecting performance—have little relevance here. "Inducement" as it reflects causation, remains the key in the instant case.

The effect of concerted action by a number of individuals becomes relevant in determining to what extent each Interstate plaintiff was influenced to break his AAMCO contract. See Prosser, *Handbook of the Law of Torts, supra*, at 937. The greatly increased potential for coercion, intimidation and economic pressure which lies in the hands of a group toward its own more reluctant members is readily apparent. Accordingly, where such factors are present, the modern view is that concerted action may itself amount to a basis of liability on each member of the group. *Keviczky v. Lorber*, 290 N.Y. 297, 49 N.E.2d 146 (1943); *Louis Kamm, Inc. v. Flink*, 113 N.J.L. 582, 175 A. 62 (1934).

■ This court, however, is convinced, after having heard the testimony and having carefully reviewed the trial transcript,

that AAMCO's claim for interference with contractual relations must fail. AAMCO has produced no evidence tending to prove that any of the plaintiffs procured a breach of contract between any other plaintiff and AAMCO. In fact, the evidence is to the contrary. Each of the plaintiffs testified as to his own reasons for leaving AAMCO, and in each instance, the reason given was the continuing battle with AAMCO over AAMCO's Parts Program and the proposed changes in the Marketing Program whereby AAMCO intended to place more franchises in the Detroit market.[4] (McAlpine—Tr at 53; Stolaruk—Tr at 211; Smith—Tr at 244; Prior—Tr at 302; Reavis—Tr at 385; Layman—Tr at 444; Stewart—Tr at 502; Folino—Tr at 625).

The weakness of AAMCO's claim that each plaintiff induced the others to breach his respective Franchise Agreement is apparent when we examine the portions of the record that pertain to the early meetings that led to the formation of Interstate Transmissions. Vincent Schlachter, whose deposition was admitted into evidence, was present at those early meetings:

Q [Mr. Schlachter] What conversations took place which you overheard at this meeting concerning the AAMCO market proposal? What concerns or feelings were expressed by the dealers here in Detroit about it?

A There was a general objection among all of us, . . . as what can be done about it, what should be done about it and what we have to do to go about having this problem changed?

Q Let me stop you there. Do I take that to mean the dealers were unanimously in agreement that something must be done in face of this proposal?

A Yes.

Q Did anyone say what must be done?

A There were a number of alternatives.

Q Why don't you tell me what they were?

A The first one was discussed there and it was mentioned at the dealers meeting in Chicago and that was that Bill McAlpine would go to Philadelphia and meet with AAMCO and see what could be done about it at that level.

Q It was discussed at this meeting in Detroit that this was one alternative, is that correct?

A Right.

Q What were the other alternatives that were discussed at this meeting?

A As a last alternative, separation was discussed.

Q Can you tell me who proposed this alternative?

A *Person for person, no.* I think it was just—it was mentioned in the meeting and at that point it was discussed.

Q Were there any individuals present at the meeting who favored such a separation at that time?

A *I think it was the general consensus that it be supported if no alternative could be arranged.*

Q All right. Was there anyone present who expressed a stronger feeling about that possibility than others expressed?

A *No, I wouldn't think so.* (Emphasis added.) (Schlachter Dep. at 15–17).

Q With respect to the split, was there discussion on that point?

A Yes.

Q Can you say who began or proposed it?

A *I don't think it was any one person.*

Q Can you say who expressed support for this alternative?

A *I would say all of us did,* if that was the last—that was the only alterna-

---

4. Stuart Adams was the only plaintiff to offer a reason for leaving AAMCO other than the fight over the Parts or Marketing Programs. Adams testified that he left AAMCO because AAMCO consistently refused to make him a franchisee after he had bought the Lincoln Park AAMCO shop from Aram Magarian (Tr at 359).

tive available. (Emphasis added.) (Schlachter Dep. at 27).

Stuart Adams' testimony at trial is in accord:

Q All right, isn't it true at the first meeting not every dealer there was in agreement that they should leave AAMCO?

A Yes.

Q Some wanted to stay, isn't that correct?

A Yes.

Q Do you remember those that wanted to stay?

A I think it was a Mr. Martin who is the only one that I know of.

Q *So you are saying some means one.*

A *Yes. I can't off hand think of any others right at this moment, sir.* (Tr at 368).

Mr. Reavis corroborated this expression of unanimity.

Q When did you make your decision to leave AAMCO?

A Well, it was a gradual thing. We tried to work things out as a group with AAMCO during the summer and fall of '73, but when it got to the point where none of us believed it could be worked out, we decided to leave AAMCO and go off in another company. (Tr at 368).

Finally, on November 20, 1973, when William McAlpine was in Philadelphia attending an AAMCO dealers meeting, the decision was made that the AAMCO Detroit franchises would leave AAMCO en masse (Tr at 126):

Q In fact, you had started to leave about October 30th not before; isn't that true, Mr. McAlpine?

A The actual decision to leave AAMCO was made after the meeting in Philadelphia on November the 20th. As soon as I left the meeting I called the Detroit dealers, I talked to John Folino, I explained the entire program to

them, to him on the telephone. He then explained it to the dealers, the Detroit dealers and they at that time took a vote and decided to leave and I said I would go, I would go with their decision. That's when the actual decision was made to leave AAMCO.

The testimony is clear that each plaintiff who left AAMCO did so without having to be induced by any of the other plaintiffs. The court is satisfied that concerted action by the Detroit AAMCO dealers did not affect the decision-making process of each plaintiff who ultimately left AAMCO. The court does not conclude that no attempts at inducement were made by at least some of the plaintiffs. Rather, the court concludes that any attempts to induce were not tortious in view of the predisposition of each plaintiff to leave AAMCO.

As for AAMCO's contention that the plaintiffs attempted to induce William Sheets, Edward Kantner and Bob Martin to breach their AAMCO Employment Agreements, this court is again satisfied that no plaintiff caused any of these third parties not to perform their AAMCO contracts.

William Sheets was employed by Interstate in December of 1975 for only two weeks. Although in 1973 and 1974, he was an operations manager for AAMCO, he had left AAMCO and had been away from AAMCO for several months at the time he was hired by the plaintiffs to work for Interstate (Tr at 61).

Edward Kantner, the AAMCO Operations Manager for Detroit, was also offered employment by the plaintiffs (Tr at 62) but he declined the offer. The record not only suggests that Mr. Kantner was desirous of the Interstate job without having to have it offered to him (Tr at 678), but there is an absence of evidence that could suggest that plaintiffs' action had a deleterious effect on Kantner's ongoing relationship with AAMCO.

Robert Martin was an AAMCO franchisee who attended all the initial meetings

leading to Interstate's formation and he, too, was offered the chance to leave AAMCO (Tr at 567, 729). But, as soon as Martin decided not to leave AAMCO, he was excluded from further discussions with the plaintiffs (Tr at 62). In fact, when plaintiff McAlpine realized that Martin would not be leaving AAMCO, McAlpine specifically warned Martin to protect his AAMCO franchise by getting an advertisement in the telephone book Yellow Pages as an AAMCO franchisee since the remaining AAMCO Detroit franchisees were no longer going to advertise themselves as AAMCO franchisees (Tr at 62, 719). McAlpine's testimony on this point is illustrative (Tr at 62):

Q Did you ever hire other than Bill Sheets, did you ever hire any AAMCO people?

A Not to my knowledge, no.

Q Did you have some of the Detroit area dealers who didn't want to leave AAMCO while this was going on?

A Yes, there were two dealers who didn't leave.

Q How did you treat them?

A Well, when it became evident that Bob Martin from Pontiac and Charlie Martin from Mt. Clemens weren't going to leave, we just didn't include them in the meetings. I didn't recruit them to join us and I am sure no one else did.

In fact, this was in November of 1973 or October of 1973, whatever the date was, and it was almost closing time for the Yellow Pages and I told Bob Martin that he should get an ad as AAMCO in the Yellow Pages because we weren't going to advertise in AAMCO and to protect himself, he should put an ad in the Yellow Pages.

Q Do you know whether or not he did so or not?

A Yes, he did.

AAMCO has failed to present this court with sufficient evidence to support its contention that the plaintiffs interfered with the contracts of AAMCO employees. This is not to suggest that all evidence is against AAMCO's contentions with respect to interference with contract. That the plaintiffs set up a non-existent Pontiac telephone answering service to compete with Robert Martin's Pontiac AAMCO center within a week after Martin had announced his attention to remain with AAMCO is evidence of an attempt to pressure Robert Martin into reconsidering his choice (Tr at 411, 569).

Other offered inducements were admitted by the plaintiffs. Vincent Schlachter, an AAMCO franchisee, was promised that Interstate would assume all his litigation fees if he broke an existing AAMCO lease to join Interstate (Tr at 32; Schlachter Dep. at 52). The gist of Schlachter's statements, though, reveal that the inducements were offered only after Schlachter had already decided to leave AAMCO (Schlachter Dep. at 52):

Q What caused you to change your mind [to leave AAMCO]?

A I had a lease with AAMCO at the time and after it was decided that a split was the only way to solve the problem I consulted with some attorneys concerning my lease and after receiving different opinions, varying opinions, on whether the lease was valid or not valid I had to make a decision and it was in November I made the decision to split.

Q Did you express any concern [to other dealers] about possible litigation coming out of this lease?

A Yes, I did . . . It was the consensus of all the dealers that if there was litigation concerning my personal problem that legal fees would be assumed by the corporation . . . There was a discussion of helping me financially if I lost the litigation and was forced to leave my business.

But, the bottom line with respect to AAMCO's interference with contract claim is that the evidence falls short of meeting AAMCO's necessary burden of proof.

Attempted interference with contract cannot rise to the level of tortious interference with contract merely because an attempt to interfere has been made. AAMCO must be able to convince this court that contracts were either broken or not entered into due to the tortious conduct of plaintiffs. Since the evidence suggests that contracts were broken because of AAMCO's inability to satisfy its Detroit dealers, this court cannot further speculate as to the added effect of the concerted activity of the plaintiffs.

Accordingly, this court denies AAMCO's claim as it pertains to interference with contractual relations.

## G. DEFENDANT'S CONSPIRACY CLAIM:

AAMCO claims in this portion of its case that prior to the termination of their Franchise Agreements with AAMCO, the plaintiffs got together and arranged among themselves to stop being AAMCO franchisees and to start up another transmission repair company, and that in connection with this pursuit held various meetings and did various acts in order that they could do business as another transmission company as soon as possible upon termination of their Agreements with AAMCO. The plaintiffs deny that this can constitute a tortious conspiracy.

There has been a good deal of discussion as to whether conspiracy is to be regarded as a separate tort in itself. See Prosser, *Handbook of the Law of Torts*, 4th Edition, 1971, at 293. On the one hand, it is clear that the mere agreement to do a wrongful act can never amount to a tort, whether or not it may be a crime, and that some act must be committed by one of the parties in pursuance of the agreement, which is itself a tort. The gist of the action is not the conspiracy charged, but the tort working damage to the plaintiff. *James v. Evans*, 149 F. 136 (3rd Cir. 1906); *Krum v. Sheppard*, 255 F.Supp. 994 (W.D.Mich.1966). On the other hand, there are certain types of conduct, such as boycotts, in which the element of combination adds such a power of coercion, undue influence or restraint of trade, that it makes unlawful acts which one man might legitimately do. As Dean Prosser wrote in the *Handbook of the Law of Torts, supra,* at 293:

> It is perhaps pointless to debate whether in such a case the combination or conspiracy becomes itself the tort, or whether it merely gives a tortious character to the acts done in furtherance of it. On either basis, it is the determining factor of liability.

But, since this court concludes that the plaintiffs were within their constitutional rights when they engaged in conduct that is alleged to have been tortiously conspiratorial, AAMCO's claim of conspiracy must be denied.

Franchisees, like all other persons in the United States, enjoy the right pursuant to the First Amendment of the United States Constitution to assemble, subject only to those exceptions specifically provided for by statute. Although a franchisee cannot combine with a competitor to fix prices, 15 U.S.C. § 1, for example, franchisee gatherings, and joint activities which do not violate the law cannot, standing alone, be actionable. *Krum v. Sheppard, supra; Dunn v. Goebel Brewing Co.,* 357 Mich. 693, 99 N.W.2d 380 (1959).

Michigan, the state where the alleged conspiratorial activities are to have occurred, recently enacted a Franchise Investment Law. M.C.L.A. § 445–1401 (P.A. No. 269, 1974), et seq. which provides in pertinent part (§ 445.1527) that a franchisor may not:

> (a) restrict the right of a franchisee to join an association of franchisees, or require a franchisee to join such an association.

One of the traditional control mechanisms of a franchisor has been to keep its franchisees disorganized. Franchisees, by necessity, must have access to the franchise

group in order to act together to deal with common problems, whether those problems be the oppressiveness of the franchisor or some less momentous concern. The fact that a contract might have been breached as a direct result of franchisee organization means nothing more than that the franchisor would have a cause of action for breach of contract.

As for AAMCO's contention that the plaintiffs held secret meetings and cautioned one another against discussing the matters outside of the meeting, this court finds nothing actionable from such conduct. AAMCO further contends that the object of these secret meetings was to withdraw and cancel all AAMCO franchises in the Detroit market, but the evidence is to the contrary.

The plaintiffs did not commence their secret meetings in September, 1973, with the objective of conspiracy to break away from AAMCO. The meetings were begun in order to discuss the franchisees' concern over AAMCO's proposed marketing plan of placing more AAMCO franchises in the Detroit area. (See Schlachter Dep. at 15–17). Separation from AAMCO was discussed as a last resort, and plans were subsequently drawn only in the event that such a contingency might occur. Not until November 20, 1973, at the last meeting the plaintiffs would hold as AAMCO franchisees, did the franchisees vote to terminate their Franchise Agreements (Tr at 26).

Accordingly, those meetings, begun as a lawful vehicle for discussing legitimate business concerns, cannot rise to the level of a tortious conspiracy particularly in light of the protections afforded by the First Amendment of the Constitution of the United States.

## DAMAGES

AAMCO is entitled to damages from the wrongful termination of its Franchise Agreements. AAMCO has asked that the damage award include:

| | | |
|---|---|---|
| (1) Accounts receivable which were never paid | = $ | 50,426 |
| (2) Franchise fees due under Franchise Agreements breached by the Inter- | | |
| state Plaintiffs (from December 1973 to time of trial) | = $ | 992,157 |
| (3) Expenses by AAMCO to re-establish its centers in Detroit (from 1974 to 1977) | = $ | 492,949 |
| (4) AAMCO's initial cost to develop the Detroit market (from 1965 to 1973) | = $ | 521,202 |
| (5) Cost of development of AAMCO's merchandising system misappropriated by Interstate Plaintiffs | = | $4,122,000 |
| TOTAL | | $6,178,734 |

The court will analyze each of these items separately to determine which amounts, if any, AAMCO is entitled to recover as its damages for the wrongful termination of Franchise Agreements.

(1) *Accounts Receivable which were never paid:*

AAMCO is entitled to recover the entire $50,426 which is claimed owing from the Interstate Plaintiffs for accounts receivable which were never paid. This figure represents $42,432 in accounts receivable which the court has already awarded, as well as $7,994 in accounts due after December 15, 1973, which were not contested but have not yet been awarded.

(2) *Franchise Fees due under Franchise Agreements:*

The court awards AAMCO $250,773.37 in lost franchise fees. In doing so, the court is awarding only that amount of actual loss which the court believes has been rendered certain by competent proof. The court thus declines to utilize AAMCO's elaborate model of projected sales for the Detroit AAMCO centers (AAMCO Exhibit 282). AAMCO's model of projected sales assumes the existence of a sustained growth trend in Detroit, but the court cannot accept such an assumption. AAMCO's estimate of future royalty income is based upon 1970 through 1973 growth trends and does not account for the new competitive entries into the Detroit market and the resulting effect upon AAMCO Detroit from such new entries. The projected growth trends are al-

together so uncertain, speculative, and remote that the court must decline to accept them.

Rather, the court has given AAMCO a recovery based upon the average monthly sales of the Detroit centers for the period January, 1973, through November, 1973 (AAMCO Exhibit 282, Table C). Such a recovery assumes that the Detroit centers would have continued at their 1973 success level. The court is willing to make this assumption. The court is satisfied that AAMCO's quick 1974 recovery in the Detroit market (Plaintiffs' Exhibit 35; Answer to Interrogatory # 48(a), Second Set) reflects enough public support of AAMCO and sufficient market stability in Detroit that the Detroit centers would at least have maintained their present level of sales.

Based upon average monthly sales in Detroit of $22,442 for each AAMCO center (AAMCO Exhibit 282, Table C), and upon an average franchise fee of 6.92 percent of gross sales for each center (Franchise Agreements, page 2, paragraph 30, the average monthly franchise fee that AAMCO received from a Detroit franchisee in 1973 was $1,552.99. The average Detroit AAMCO center would have been responsible to AAMCO for $68,331.56 in franchise royalties through July 23, 1977—the date in which AAMCO's new Detroit franchises finally generated as much in royalties as did the 1973 Detroit franchises, the date in which "lost franchisee fees" therefore ceased being a proper item of damages. ▮ The court believes that AAMCO is entitled to lost franchise fees through July 23, 1977 for ten Detroit AAMCO centers:

| (1) | McAlpine | – | Detroit |
|-----|----------|---|---------|
| (2) | Folino/Stolaruk | – | Garden City |
| (3) | Stewart/Layman | – | Warren |
| (4) | Stewart/Layman | – | Clawson |
| (5) | Smith | – | Livernois |
| (6) | Smith | – | Conant |
| (7) | Smith | – | Gratiot |
| (8) | Reavis | · | Dearborn |
| (9) | Magarian | – | Lincoln Park |
| (10) | Prior | – | Warren |

The court will not award AAMCO lost franchise fees for the McAlpine/Folino shop in Farmington, however. The Farmington center never opened as an AAMCO center. The court declines to speculate on the income stream that a non-established business would have generated. Since AAMCO never received franchise fees from the McAlpine/Folino shop, the court has no basis for assuming that AAMCO would ever have received royalties from that shop. If the court were to award such fees AAMCO would be receiving a windfall based on speculation and conjecture. Without a past history of income generated to AAMCO from this center, "lost franchise fees" cannot be a proper item of damages.

The court further believes that the $683,-315.60[5] in lost franchise fees which the court has found owing to AAMCO through July 23, 1977, has been partially mitigated. Plaintiffs' Exhibit 35 establishes that AAMCO's re-entry into the Detroit market generated $432,542.22 in franchise fees through July 23, 1977. This entire figure must be included for purposes of AAMCO's duty to mitigate damages. AAMCO in November 1973 had agreed to place a moratorium on expansion in Detroit for 1974, 1975, and 1976. Thus, the income stream generated by its new Detroit franchises is not in addition to the income stream that would have been generated by the ten franchises that left AAMCO. Such new income stream is in lieu of AAMCO's expected income stream from Detroit, and would not have been generated if the Interstate Plaintiffs were still associated with AAMCO. AAMCO is entitled to a total income stream of $683,315.60 for the period December, 1973, through July, 1977. AAMCO has already received $432,-542.33 of that amount from its new franchises. AAMCO is owed $250,773.37 in lost franchise fees from its ten old franchises.

---

5. This figure is arrived at in the following manner: the average Detroit center would have been responsible to AAMCO for $68,331.56 in franchise royalties through July 23, 1977. The court has determined that ten centers are collectively responsible to AAMCO for this amount.

(3) *Expenses by AAMCO to re-establish its centers in Detroit from 1974 to 1977*

AAMCO claims $492,949 as its costs of re-developing the Detroit market (AAMCO Exhibit 430; Exhibit 430A, Table E–1). The breakdown is as follows:

Expenses Incurred to Redevelop the Detroit Market

| | | |
|---|---|---|
| (a) | Travel Expenses | $ 59,302 |
| (b) | Payroll Expenses | 48,848 |
| (c) | Employee Welfare Expenses | 7,327 |
| (d) | Purdy Co., Inc., Expenses | 62,913 |
| (e) | Advertising Expense | 90,989 |
| (f) | Telephone Expense | 4,782 |
| (g) | Real Estate Expenses | 11,550 |
| (h) | Franchising Expense | 100,194 |
| (i) | Business Opportunity Advertising Expense | 39,349 |
| (j) | M.I.T. Department Expense | 13,401 |
| (k) | Executive Salaries and Overhead | 54,294 |
| | Total Expenses | $492,949 |

AAMCO has provided detailed records of four years of expenditures made in order to re-establish itself in the Detroit market at a level equal to the rate of franchise royalties generated by the franchises that left AAMCO. But the court concludes that AAMCO had successfully re-entered the Detroit market by the end of 1974. This conclusion is reached for two reasons.

First, the court has already noted that when the Interstate franchisees left AAMCO those franchisees could not take the AAMCO good-will and market identity with them. AAMCO's continuation of its general Detroit advertising program during the critical months following the franchisee exodus helped immeasurably in keeping this good-will and market identity. Mr. William Shnycer testified for AAMCO that AAMCO bought advertisements in the local papers, on radio, and on television with greater frequency than normal during this critical period. As a result AAMCO never really lost its strong position in the Detroit market.

On April 22, 1974, 120 days after the franchisees had left, the first of AAMCO's new shops opened in Detroit. (Defendant's Answer to Interrogatories, # 48, Second Set). By June, 1974, two more AAMCO shops had opened, and by October 28, 1974 —only 11 months after the breach—there were four new AAMCO centers in Detroit.

The existence of four franchises set up in so short a time plus the continuation of the AAMCO good-will throughout this period convinces the court that AAMCO was successfully re-entrenched in Detroit by the end of 1974.

Secondly, by the end of 1974, AAMCO's four new centers in Detroit as well as the three existing dealers in Pontiac, Mount Clemens, and Windsor were all benefiting each time AAMCO personnel came to Detroit. These dealers received regular attention from AAMCO after 1974. It is clear that many of the AAMCO personnel who were in Detroit after mid-1974 and were included in AAMCO's damage computations were doing what AAMCO personnel did in Detroit with respect to the old AAMCO dealers. After 1974, AAMCO's time spent in and connected with Detroit went increasingly toward maintaining its new centers, not to re-establishing an alleged lost market. Beyond 1974, AAMCO expenditures were only partially being made toward redevelopment. If the court were to award damages for re-establishment after December 31, 1974, the court would be forced to speculate as to the proper allocation of expenditures between re-establishment and servicing of existing dealers. This type of speculation is unwarranted and impermissible. The court will accordingly use December 31, 1974, as the cut-off date for expenditures to re-establish the Detroit market since this is the last date that damages can be fixed with the reasonable degree of certainty that is required.

The court must thus analyze each specific expense AAMCO claims as having been made in 1974 in order to determine those amounts AAMCO is entitled to in damages for the cost of reestablishing itself in Detroit:

(a) *Travel Expenses*

The court awards AAMCO $21,970.52 for travel expenditures incurred by AAMCO in 1974. Such figure represents AAMCO's travel cost of dispatching personnel to Detroit to re-establish AAMCO's po-

sition in the Detroit market. The court is satisfied that these expenditures would not have been incurred had the Interstate Plaintiffs not breached their AAMCO Franchise Agreements. The court, in concluding that AAMCO was re-established in Detroit by December 31, 1974, does not award AAMCO its alleged travel expenses for 1975 or 1976.

The court has reached its determination of $21,970.52 by using AAMCO's Exhibit 430, Tables C–4, C–5b, and C–5c.

#### (b) *Payroll Expenses*

The court awards AAMCO $21,281.60 for payroll expenses incurred in connection with re-establishing itself in Detroit through December 31, 1974 (AAMCO Exhibit 430, Tables D–2 and D–4). This figure represents AAMCO's cost in personnel salary to re-establish itself in Detroit. A portion of this expense includes those man hours spent in servicing existing centers as well as the new Detroit franchises that opened in 1974. But such attention to existing and newly opened centers is part of the cost of re-establishing a successful organization in Detroit. AAMCO is entitled to include the cost of this special attention as part of its damages. Such attention to existing centers allowed AAMCO to maintain its foothold and stability in the Detroit market. The special attention to newly opened centers was necessary to ensure that such centers would be able to survive in a competitive field. AAMCO nurtured its new centers in 1974 with special attention to ensure their success. The court, in cutting off AAMCO's re-establishment damages as of December 31, 1974, believes that this special attention helped ensure AAMCO stability in Detroit and a quick recovery in the Detroit market.

#### (c) *Employee Welfare Expenses*

AAMCO claims that it is entitled to repayment for the employee Fringe Benefits that correspond to employee salary expend-

ed on re-development because employee benefits cost AAMCO 15 cents on each dollar paid for employee salary. Although the payment of fringe benefits is part of AAMCO's total employee expenses, the court is awarding damages for the cost of lost man-hours, not for the cost of AAMCO's total employee expenses.

The court thus declines to award AAMCO its cost of employee benefits over and above employee salary. The cost of such benefits, which include medical and life insurance as well as vacation pay and sick leave, cannot be attributed to re-developing the Detroit market. Whereas AAMCO is entitled to the cost of personnel salary in *lost* man-hours expended because of the Detroit crisis, employee fringe benefits are not part of these lost man-hours. Fringe benefits would have been paid regardless of whether the lost man-hours were expended on Detroit re-development or on some other aspect of AAMCO marketing.

#### (d) *Purdy Company, Inc. Expenses*

Purdy Company is a wholly owned subsidiary of AAMCO, established in Detroit in December, 1973 to enable AAMCO to buy locations and sell new franchises in the Detroit area.

The court's finding that AAMCO was re-established in the Detroit market by December 31, 1974, precludes the court from considering any costs incurred by Purdy Company after that date. The damages in question are therefore only $34,261 [6] of the $62,913 claimed by AAMCO for Purdy Company's expenses. (AAMCO Exhibit 430, Table F–1). The court declines to consider the $14,243 AAMCO alleges as damages for Purdy Company's "Plant, Property and Equipment" (AAMCO Exhibit 430, Table F–6). Such property, which is listed among Purdy Company's assets in Table F–6, has operational as well as salvage value. AAMCO has neither attempted to re-sell this property nor has it proven that such property does not have market value to AAMCO

---

**6.** Since Purdy Company has a fiscal year ending on September 30, the court used 25% of Purdy Company's net earning loss for 1975 as

well as Purdy Company's net income loss for 1974 in computing Purdy Company's net loss to December 31, 1974.

which is less than the $14,243 alleged as damage for the property's original cost to AAMCO. Such failures to mitigate and prove are fatal to AAMCO's claim on this item of alleged damage.

AAMCO's failure to segregate costs is also fatal—to AAMCO's claim for Purdy Company's $34,261 loss. More than half of Purdy's costs and expenses through December 31, 1974, are derived from the category AAMCO has marked as "selling, general, and administrative" (AAMCO Exhibit 430, Tables F–2 and F–3). Since the court has already awarded AAMCO damages for the cost of man-hours spent on re-developing the Detroit market, and since other items of alleged damages encompass AAMCO's general costs of selling franchises (AAMCO Exhibit 430, Table J–1) and advertising for franchisees (AAMCO Exhibit 430, Tables G–1 and K–1), the court believes that any recovery given AAMCO for Purdy Company expenses would be in the nature of a double recovery for items of damage already considered elsewhere. Furthermore, William Shnycer's testimony for AAMCO on Purdy Company expenses revealed that although Purdy Company absorbed losses for the first twenty weeks of operation, Purdy Company did not operate at a net loss to AAMCO. The court cannot award damages for Purdy Company expenses in the face of such testimony from AAMCO's own expert witness.

### (e) Advertising Expenses

The court awards AAMCO $54,000 for advertising expenses incurred in re-establishing itself in the Detroit market. The court believes that one of the major factors contributing to AAMCO's rapid recovery in Detroit was AAMCO's increased radio, television, and newspaper advertisements throughout Detroit in 1974. Such a program was instrumental in keeping AAMCO's name before the Detroit public and in convincing the public that AAMCO had never really left Detroit. Such advertising expenditures helped AAMCO mitigate its damages by shortening the transition period for new AAMCO centers to successfully compete in the Detroit market. William Shnycer, AAMCO's Vice President in charge of management, testified for AAMCO that AAMCO spent $2,000 per week in Detroit advertising in 1974 in an effort to ensure that AAMCO's name remain in the public eye. AAMCO is entitled to recover these weekly advertising expenses as part of its necessary costs of re-establishment in the Detroit market.

The court cuts off the damage period of advertising expenses at June 17, 1974, however. On that date three new AAMCO centers had opened in Detroit. With three other AAMCO centers also in Detroit—in Pontiac, Windsor, and Mt. Clemens—AAMCO's advertising costs as of June 17 were being used more to support existing franchises than to affect re-establishment. AAMCO was not fully re-established in Detroit until the end of 1974, but the court finds that by June, 1974, AAMCO's advertising expenses had already ceased being an item of re-establishment damages. AAMCO's recovery is therefore limited to $54,000 of the $92,059 claimed.

The court similarly declines to award AAMCO advertising expenses for Yellow Pages ads placed in the 1974 Pontiac, Windsor, and North Detroit area phone books. Because existing AAMCO centers, particularly in Pontiac and Windsor, were primary beneficiaries of these advertisements, the court does not believe that such expenses can be attributed to the cost of re-establishment.

AAMCO has claimed an additional $3,100 expense for Berkley, Michigan advertising. But such expense was neither addressed by AAMCO at trial nor since been proven to be an actual cost of re-establishment. Such a damage claim for a past actuality requires corroborative empiricism if the court is to accept it as a reasonably certain proof. AAMCO has had the opportunity for corroboration of this $3,100 claim and has not met its burden. This court can not consider the item.

### (f) Telephone Expense

This alleged $4,782 telephone expense was incurred by AAMCO after December

31, 1974 (AAMCO Exhibit 430, Tables H–2, H–3, and H–4). Since the court has determined that AAMCO was re-established in the Detroit market by December 31, 1974, none of this expense is a proper item of re-establishment damages.

### (g) Real Estate Expenses

AAMCO's claim of $11,550 for real estate expenses was similarly incurred after the December 31, 1974, cut-off period for damages attributable to the AAMCO's cost of re-establishment in Detroit. As such, this item is not a proper cost of re-establishment.

### (h) Franchising Expense

AAMCO is entitled to recover certain costs incurred through December 31, 1977, for re-establishing its franchises in Detroit. Because AAMCO had decided in 1973 not to expand in Detroit until 1977, Franchising Expense is not a cost AAMCO would have incurred if not for the termination of Franchise Agreements. Consequently, the court awards AAMCO $14,190 for its costs in franchising expense.

The court's conclusion is based upon its prior finding that AAMCO was re-established in the Detroit market with three new franchises by December 31, 1974. AAMCO Exhibit 430, Table J–26 establishes that each of the first two of these Detroit franchises cost AAMCO $3,595 in departmental expense per contract and the third franchise cost AAMCO $4,615 in departmental expense for that contract. The first two of these contracts further each cost AAMCO $187.50 in contract administration expenses, and the third contract cost AAMCO $238 in contract administration expenses. The cost to AAMCO's training department was $324 to train the first franchisee, and $724 to train each of the second and third franchisees. The total cost to AAMCO in franchising expense for re-establishing itself in the Detroit market with these three new franchisees was therefore $14,190.

### (i) Business Opportunity Advertising Expense

Of the $39,349 claimed by AAMCO as Business Opportunity Advertising expenses for the cost of re-establishing itself in Detroit, only $11,479 of this amount was incurred between December, 1973 and December 31, 1974 (AAMCO Exhibit 430, Tables K–2 and K–3). $11,479 is thus the amount that will be considered by the court for purposes of damage computations. The court, however, declines to award AAMCO any of this $11,479, for the court believes that such expenditures—which consisted of paid advertisements in the Detroit Free Press, Detroit News, and Midwest edition of the Wall Street Journal soliciting for qualified franchisees to join AAMCO—are not a necessary item of re-establishment damage. AAMCO has already been awarded damages for the cost of procuring the franchise contracts necessary to re-establish itself in Detroit. No proof was offered at trial to suggest that these newspaper advertisements had anything to do with AAMCO finding the three new franchisees whose AAMCO centers re-established AAMCO in the Detroit market.

These Business Opportunity expenditures may have had the effect of encouraging future franchisees to join AAMCO; but since such franchisees would have joined AAMCO after the expiration of the damage period on December 31, 1974, such expenditures are not attributable to the cost of re-development. The court cannot engage in speculation to determine the effect of the expenditures upon the three franchisees who did join AAMCO in Detroit in 1974, and AAMCO's failure of proof precludes the court from awarding damages for this expense.

AAMCO incurred the Business Opportunity Advertising expenditure in hopes that it would help them attract qualified franchisees to the Detroit market. But unlike the general advertising expenditures which succeeded in keeping AAMCO's name and good will in the public eye—thereby helping shorten the damage period for re-establishment—Business Opportunity expenditures

were not proven in any way to have affected AAMCO's re-establishment in the Detroit market by December, 1974. The columns of figures showing $11,479 in expenditures through December, 1974 are therefore insufficient as an item of damage. Such expenditures are meaningless absent proof of their effect on AAMCO's re-establishment in the Detroit market.

(j) *M.I.T. Department Expense*

This entire $13,401 Management-In-Training expense was incurred in 1975 and 1976—after the damage period for re-establishment had expired on December 31, 1974 (AAMCO Exhibit 430, Table L). Consequently, such expense is not an appropriate item of damage incurred by AAMCO to re-develop the Detroit market.

(k) *Executive Salaries and Overhead*

AAMCO claims $54,294 for the cost of executive salaries and overhead allocated for executive participation in the Detroit market re-development. Only $30,078 of this amount reflects executive participation prior to December 31, 1974, and as such, $30,078 is the relevant amount in question.

The court will not award AAMCO any of this $30,078 for executive salaries and overhead, however. AAMCO's proofs on this item are non-existent and AAMCO has admitted that the details of their computations are "not [an] integral part of these work papers." (AAMCO Exhibit 430, Table M). AAMCO has derived its cost of executive salaries and overhead expended for Detroit market re-development by listing those Executives who worked on Detroit market re-development and by assigning 5% of their salaries to "executive time" and 5% of their salaries to "executive overhead". Such is AAMCO's proof of expenditures for executive salary and overhead in re-establishing the AAMCO–Detroit market.

Mr. Bohn, AAMCO's management consultant who testified as to AAMCO's costs to re-establish itself in the Detroit market, stated that AAMCO used a conservative percentage in arriving at the 5% allocation. But AAMCO's belief that an allocation of 5% is "reasonable" does not obviate their need to establish this figure by competent proof. Because empirical data that could have been used to corroborate the reasonableness of the five percent allocation was not presented at trial, the court has no basis for determining the reasonableness of AAMCO's allocations.

AAMCO has provided no set-off for the amount of time that its executives would normally have devoted to AAMCO's Detroit market, nor has AAMCO presented any evidence that would explain what its executives were actually doing with respect to Detroit market re-development in 1974. AAMCO was able to present competent evidence of its franchise salesmen, operations managers and real estate personnel having worked toward re-development, and the court awarded damages to AAMCO for that work. But the court cannot award damages for executive work without any evidence to prove either the existence or the extent of that work.

AAMCO knew as early as December, 1973, that it would be claiming damages for re-establishment. AAMCO knew that it would have to prove re-establishment costs with specificity. AAMCO had the opportunity to keep the kind of activity reports which would have provided reasonably certain proofs. AAMCO has failed in this burden of proof. Accordingly, the court declines to award damages for "Executive Time and Overhead."

The total amount of damages thus awarded to AAMCO for having to re-establish itself in the Detroit market is $111,509.12.

(4) *AAMCO's initial cost to develop the Detroit market from 1965–1973:*

Every year from 1965 to 1973, AAMCO was recouping its original investment in the Detroit market. The amounts that AAMCO received in franchise fees during this period reveal that AAMCO has long since recouped its initial investment in Detroit. Furthermore, when the Detroit franchisees left AAMCO, they did not take with them

the AAMCO good-will and the strong AAMCO identity in the field of transmission repair which had been building in Detroit since 1965. Thus, much if not all of AAMCO's cost of developing the Detroit market remained in Detroit via this good will and identity which the Interstate Plaintiffs left for future AAMCO franchisees. AAMCO's quick recovery in the Detroit market after the Interstate Plaintiffs left is illustrative of the value of its existing good-will and its market strength in the Detroit area.

AAMCO's failure to recognize this good-will would require that the court indulge in speculation as to its value. The court has no way of knowing how much if not all of AAMCO's initial advertising, marketing, and development costs for Detroit still remain via the AAMCO good-will in Detroit. The court will therefore not award damages for what may well be an imaginary loss.

(5) *Cost of developing the AAMCO merchandising system*:

This court has already held that the Interstate Plaintiffs did not misappropriate AAMCO's merchandising system. Since there was no misappropriation, AAMCO is not entitled to restitution for unjust enrichment.

(6) *Punitive Damages*

The only conduct in this case which gives rise to an award of damages is the Interstate Plaintiffs' breach of contract. The rules as to damages for breach of contract are applied for the purpose of giving compensation for injury done, and not for punishment of wrongdoers. Punitive damages are seldom recoverable for breach of contract; when they are recoverable it is because the conduct involved falls within or is closely analogous to the field of tort—i. e., fraudulent misrepresentation. This court has not found the type of egregious conduct which would justify an award of punitive damages.

## CONCLUSION

The total amount of damages owed to AAMCO from the nine Interstate Plaintiffs is $412,708.49. The individual debt owed by each Interstate Plaintiff shall be computed in the following manner:

(1) The $250,773.37 awarded for lost franchise fees will be pro rated among the already enumerated ten Detroit Interstate centers that broke away from AAMCO. The pro rata shall be based upon that percentage of total Detroit franchise fees paid by each of the ten centers in 1973. AAMCO shall determine the percentages and submit the calculations to the court for inspection and approval.

(2) Re-establishment damages owing to AAMCO—$111,509.12—shall be pro rated evenly among each of the ten Interstate centers. Since the court has previously determined that neither conspiracy nor concerted action by the Interstate Plaintiffs was actionable, the plaintiffs shall not be jointly and severally liable for the entire award. Each plaintiff shall only be responsible for those damages which the court has attributed to that plaintiff's center or centers. This amount is $11,150.91 per center. In the situation of jointly-owned centers, each of the joint owners will be liable according to his ownership interest in his particular center.

(3) The $50,426 in accounts receivable owed to AAMCO shall be apportioned according to AAMCO Exhibit 430, Tables A–1 and B–1.

A judgment in accordance with this opinion should be presented for entry by the defendant after approval as to form by the plaintiffs.